LEWIS, J.
This ease is before the Court to answer four questions of Florida law certified by the United States Court of Appeals for the Eleventh Circuit that are determinative of a cause pending in that court and for which there appears to be no controlling precedent. We have jurisdiction. Art. V, § 3(b)(6), Fla. Const. In Estate of McCall v. United States, 642 F.3d 944 (11th Cir.2011), the Eleventh Circuit certified the following questions:
(1) DOES THE STATUTORY CAP ON NONECONOMIC DAMAGES, FLA. STAT. § 766.118, VIOLATE THE RIGHT TO EQUAL PROTECTION UNDER ARTICLE I, SECTION 2 OF THE FLORIDA CONSTITUTION?
(2) DOES THE STATUTORY CAP ON NONECONOMIC DAMAGES, FLA. STAT. § 766.118, VIOLATE THE RIGHT OF ACCESS TO THE COURTS UNDER ARTICLE I, SECTION 21 OF THE FLORIDA CONSTITUTION?
(3) DOES THE STATUTORY CAP ON NONECONOMIC DAMAGES, FLA. STAT. § 766.118, VIOLATE THE RIGHT TO TRIAL BY JURY UNDER ARTICLE I, SECTION 22 OF THE FLORIDA CONSTITUTION?
(4) DOES THE STATUTORY CAP ON NONECONOMIC DAMAGES, FLA. STAT. § 766.118, violate the separation of powers guaranteed by ARTICLE II, SECTION 3 and ARTICLE V, SECTION 1 OF THE FLORIDA CONSTITUTION?
Id. at 952-53. Because this case involves a wrongful death, we rephrase the first certified question as follows:
DOES THE STATUTORY CAP ON WRONGFUL DEATH NONECONOMIC DAMAGES, FLA. STAT. § 766.118, VIOLATE THE RIGHT TO EQUAL PROTECTION UNDER ARTICLE I, SECTION 2 OF THE FLORIDA CONSTITUTION?
As explained below, we answer the first rephrased certified question in the affirmative and hold that the cap on wrongful death noneconomic damages provided in section 766.118, Florida Statutes, violates the Equal Protection Clause of the Florida Constitution. We find it unnecessary to answer the remaining certified questions because Florida’s Wrongful Death Act is of statutory origin, and the present case is under the Federal Tort Claims Act and its procedures.
FACTS AND PROCEDURAL HISTORY
In its opinion, the Eleventh Circuit detailed the facts regarding the legal action filed by the estate of Michelle McCall, Ms. McCall’s parents, and the father of Ms. McCall’s son (Petitioners) against the United States:
During June 2005, Michelle McCall received prenatal medical care at a United States Air Force clinic as an Air Force dependent. Ms. McCall opted for the Air Force’s family practice department to provide primary prenatal care and delivery services throughout her pregnancy. She had a healthy and normal pregnancy until the last trimester. On February 21, 2006, test results revealed that Ms. McCall’s blood pressure was high and that she was suffering from severe preeclampsia. Ms. McCall’s serious condition required that labor be induced immediately.
*898 Instead of transferring Ms. McCall to the OB/GYN department, the family-practice department continued to provide medical care. The Air Force hospital was temporarily unavailable for obstetric and delivery services, so members of the family practice department transferred Ms. McCall to the Fort Walton Beach Medical Center instead. There, Air Force family practice doctors treated Ms. McCall for hypertension and induced labor. When Ms. McCall dilated to five centimeters, her contractions slowed and became weaker. The Air Force family practice doctors treating Ms. McCall called an Air Force obstetrician, Dr. Archibald, and asked if he could perform a cesarean section. Dr. Archibald reported that he was performing another surgery and would not be available to perform a cesarean section on Ms. McCall until after he finished that surgery. The Air Force family practice doctors prepared Ms. McCall for a cesarean section but did not call other obstetricians to determine if one was available to provide immediate medical care.
On February 22, 2006, Dr. Archibald finally arrived to perform the cesarean section, but Ms. McCall’s contractions had resumed and the Air Force family practice doctors decided to allow Ms. McCall to deliver vaginally. Dr. Archibald left the Foi't Walton Medical Center. On February 23, 2006 at 1:25 a.m., Ms. McCall delivered a healthy baby boy. Family members who visited Ms. McCall after the delivery expressed concerns about the amount of blood Ms. McCall had lost during delivery. Medical personnel assured these family members that Ms. McCall was stable.
Thirty-five minutes later, when the placenta had not delivered as expected, two family practice doctors from the family practice department tried without success to manually extract the placenta. An Air Force nurse anesthetist administered additional epidural pain relief and gave Ms. McCall two separate doses of Morphine intravenously. Around 2:35 a.m., the family practice department doctors called Dr. Archibald, the obstetrician, for assistance when they could not remove the placenta manually.
Ms. McCall’s blood pressure began to drop rapidly and remained dangerously low over the next two and a half hours. The Air Force nurse anesthetist monitoring Ms. McCall’s vital signs did not notify the family practice doctors of the drop in Ms. McCall’s blood pressure. Dr. Archibald arrived at 2:45 a.m. and removed the placenta within five minutes. The family practice department doctors informed Dr. Archibald that Ms. McCall had not lost much blood during delivery. Dr. Archibald, however, noticed severe vaginal lacerations and worked to repair them over the next hour. During that time, the Air Force nurse anesthetist monitored Ms. McCall’s vital signs, reported to Dr. Archibald that they were stable, and failed to inform him that Ms. McCall’s blood pressure was dangerously low and continuing to drop. Dr. Archibald never checked the vital signs himself and relied exclusively on the nurse to inform him of any blood pressure changes or problems.
At 3:50 a.m. when Dr. Archibald finished his work, he requested an immediate blood count and, if needed, a transfusion to compensate for the blood Ms. McCall lost during the procedure. Forty minutes later, the family practice department physician ordered the blood count test. Forty minutes after that, and over an hour after Dr. Archibald had requested immediate blood work, a nurse attempted to draw blood from Ms. *899 McCall. Ms. McCall was unresponsive. She had gone into shock and cardiac arrest as a result of severe blood loss. It is not clear how long Ms. McCall had been in this state, since no one had monitored her or checked her status for the hour following Dr. Archibald’s procedure. Ms. McCall never regained consciousness and was removed from life support on February 27, 2006.
Id. at 946-47.
The Petitioners filed an action against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-80. Id. at 947. In addition to finding the United States liable under the FTCA, the United States District Court for the Northern District of Florida determined that the Petitioners’ economic damages, or financial losses, amounted to $980,462.40. Id. The district court concluded that the Petitioners’ noneconomic damages, or nonfinancial losses, totaled $2 million, including $500,000 for Ms. McCall’s son and $750,000 for each of her parents. Id.
However, the district court limited the Petitioners’ recovery of wrongful death noneconomic damages to $1 million upon application of section 766.118(2), Florida Statutes (2005), Florida’s statutory cap on wrongful death noneconomic damages based on medical malpractice claims. Id.[1] The district court denied a motion filed by the Petitioners that challenged the constitutionality of Florida’s wrongful death statutory cap under both the Florida and United States Constitutions. Id. The district court also denied the Petitioners’ motion to alter or amend the judgment. Id. at 947-48.
On appeal to the Eleventh Circuit, the Petitioners challenged the district court’s rulings with regard to both the application and the constitutionality of the cap mandated by Florida law on wrongful death noneconomic damages for medical malpractice claims. Id. at 948. The Petitioners contended that the statutory cap violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and constitutes a taking in violation of the Fifth Amendment of the United States Constitution. Id. They also asserted that the cap violates the following provisions of the Florida Constitution: (1) the separation of powers guarantee in article II, section 3 and article V, section 1; (2) the right to trial by jury under article I, section 22; (3) the right of access to the courts under article I, section 21; (4) the right to equal protection under article I, section 2; and (5) the prohibition against the taking of private property without full compensation under article X, section 6. Id.
The Eleventh Circuit affirmed the application of the statutory cap on noneconomic damages and held that the statute does not constitute a taking in violation of article X, section 6, of the Florida Constitution. Id. at 953. The federal appellate court also held that the cap does not violate either the Equal Protection Clause or the Takings Clause of the United States Constitution. Id. However, the Eleventh Circuit granted a motion filed by the Petitioners to certify four questions to this Court regarding the remaining challenges to the statutory cap under the Florida Constitution. Id.
*900 STATUTORY PROVISION
At issue is Florida’s statutory cap on wrongful death[2] noneconomic damages in medical negligence actions as articulated in section 766.118. Section 766.118(2) states:
(2) Limitation on noneconomic damages for negligence of practitioners.—
(a) With respect to a cause of action for personal injury or wrongful death arising from medical negligence of practitioners, regardless of the number of such practitioner defendants, noneco-nomic damages shall not exceed $500,000 per claimant. No practitioner shall be liable for more than $500,000 in noneconomic damages, regardless of the number of claimants.
(b) Notwithstanding paragraph (a), if the negligence resulted in a permanent vegetative state or death, the total non-economic damages recoverable from all practitioners, regardless of the number of claimants, under this paragraph shall not exceed $1 million. In cases that do not involve death or permanent vegetative state, the patient injured by medical negligence may recover noneconomic damages not to exceed $1 million if:
1. The trial court determines that a manifest injustice would occur unless increased noneconomic damages are awarded, based on a finding that because of the special circumstances of the case, the noneconomic harm sustained by the injured patient was particularly severe; and
2. The trier of fact determines that the defendant’s negligence caused a catastrophic injury to the patient.
(c)The total noneconomic damages recoverable by all claimants from all practitioner defendants under this subsection shall not exceed $1 million in the aggregate.
§ 766.118(2), Fla. Stat.[3] Noneconomic damages refer to “nonfinancial losses ... including pain and suffering, inconvenience, physical impairment, mental anguish ... loss of capacity for enjoyment of life, and other nonfinancial losses to the extent the claimant is entitled to recover such damages under general law, including the Wrongful Death Act.” § 766.202(8), Fla. Stat. (2005) (incorporated in § 766.118(l)(b), Fla. Stat. (2005)).
EQUAL PROTECTION
We have rephrased the first question certified to this Court by the Eleventh Circuit which addresses whether the cap on wrongful death noneconomic damages under section 766.118 violates the right to equal protection guaranteed by the Florida Constitution. The Florida Constitution provides, in pertinent part:
All natural persons, female and male alike, are equal before the law. Art. I, § 2, Fla. Const. This Court has stated *901 “[t]he constitutional right of equal protection of the laws means that everyone is entitled to stand before the law on equal terms with, to enjoy the same rights as belong to, and to bear the same burden as are imposed upon others in a like situation.” Caldwell v. Mann, 157 Fla. 633, 26 So.2d 788, 790 (1946).
Unless a suspect class or fundamental right protected by the Florida Constitution is implicated by the challenged provision, the rational basis test will apply to evaluate an equal protection challenge. See Amerisure Ins. Co. v. State Farm Mut. Auto. Ins. Co., 897 So.2d 1287, 1291 n. 2 (Fla.2005). To satisfy the rational basis test, a statute must bear a rational and reasonable relationship to a legitimate state objective, and it cannot be arbitrary or capriciously imposed. Dep’t of Corr. v. Fla. Nurses Ass’n, 508 So.2d 317, 319 (Fla.1987). Stated another way, the test for consideration of equal protection is whether individuals have been classified separately based on a difference which has a reasonable relationship to the applicable statute, and the classification can never be made arbitrarily without a reasonable and rational basis.
Having carefully considered the arguments of both parties and the amici, we conclude that section 766.118 violates the Equal Protection Clause of the Florida Constitution under the rational basis test. The statutory cap on wrongful death non-economic damages fails because it imposes unfair and illogical burdens on injured parties when an act of medical negligence gives rise to multiple claimants. In such circumstances, medical malpractice claimants do not receive the same rights to full compensation because of arbitrarily diminished compensation for legally cognizable claims. Further, the statutory cap on wrongful death noneconomic damages does not bear a rational relationship to the stated purpose that the cap is purported to address, the alleged medical malpractice insurance crisis in Florida.
Arbitrary Distinctions
This Court previously reasoned in St. Mary’s Hospital, Inc. v. Phillipe, 769 So.2d 961 (Fla.2000), that the type of classification addressed in this case is purely arbitrary and unrelated to a true state interest. We clearly announced in Phil-lipe that aggregate caps or limitations on noneconomic damages violate equal protection guarantees under the Florida Constitution when applied without regard to the number of claimants entitled to recovery. This inherently discriminatory action and resulting invidious discrimination do not pass constitutional muster. We stated:
If we were to accept St. Mary’s contention that the Legislature intended to limit noneconomic damages to $250,000 per incident in the aggregate, then the death of a wife who leaves only a surviving spouse to claim the $250,000 is not equal to the death of a wife who leaves a surviving spouse and four minor children, resulting in five claimants to divide $250,000. We fail to see how this classification bears any rational relationship to the Legislature’s stated goal of alleviating the financial crisis in the medical liability industry. Such a categorization offends the fundamental notion of equal justice under the law and can only be described as purely arbitrary and unrelated to any state interest.
Id. at 972 (emphasis supplied).
The equal protection violation identified by Phillipe is evident in the present case. The plain language of this statutory plan irrationally impacts circumstances which have multiple claimants/survivors differently and far less favorably than circumstances in which there is a single claimant/survivor and also exacts an irrational *902 and unreasonable cost and impact when, as here, the victim of medical negligence has a large family, all of whom have been adversely impacted and affected by the death. Three separate noneconomic damage determinations were assessed by the federal district court based on the evidence presented. The damages suffered by Ms. McCall’s parents were determined to be $750,000 each, and Ms. McCall’s surviving son sustained damages determined to be $500,000. Applying the cap, the federal court then reduced the amounts of damages so each claimant would receive only half of his or her respective damages. Yet, if Ms. McCall had been survived only by her son, he would have recovered the full amount of his noneconomic damages: $500,000. Here, the cap delineated in section 766.118 limited the recovery of a surviving child (and surviving parents) simply because others also suffered losses. In a larger context, under section 766.118, the greater the number of survivors and the more devastating their losses are, the less likely they are to be fully compensated for those losses.
Other state supreme courts have struck down caps on noneconomic damages based upon a similar rationale. In holding that a $500,000 cap per plaintiff on noneconomic damages in negligence and product liability actions violated the state constitution,[4] the Supreme Court of Illinois aptly described how the cap operated to discriminate against claimants who have suffered the most grievous injuries, while benefit-ting the tortfeasor and/or the insurance company:
In the first example ... three plaintiffs are injured as a result of the same tortfeasor’s negligence. Plaintiff A is injured moderately, and suffers pain, disability and disfigurement for a month. Plaintiff B is severely injured and suffers one year of pain and disability. Plaintiff C is drastically injured, and suffers permanent pain and disability.... [I]t is further assumed that a jury awards plaintiffs A and B $100,000 in compensatory damages for noneco-nomic injuries. Plaintiff C receives $1 million for his permanent, lifelong pain and disability.
... With respect to plaintiff C, [the challenged legislation] arbitrarily and automatically reduces the jury’s award for a lifetime of pain and disability, without regard to whether or not the verdict, before reduction, was reasonable and fair.
The tortfeasors in this example are also treated differently, without any justification. The tortfeasor who injures plaintiffs A and B is liable for the full amount of fairly assessed compensatory damages. In contrast, [the challenged legislation] confers a benefit on the similarly situated tortfeasor who injures plaintiff C. This tortfeasor pays only a portion of fairly assessed compensatory damages because of the limitation [on noneconomic damages]. Therefore, the statute discriminates between slightly and severely injured plaintiffs, and also between tortfeasors who cause severe and moderate or minor injuries.
*903 Best v. Taylor Mach. Works, 179 Ill.2d 367, 228 Ill.Dec. 636, 689 N.E.2d 1057, 1075 (1997) (emphasis supplied). The Supreme Court of New Hampshire condemned on equal protection grounds a $250,000 cap on noneconomic damages in medical malpractice cases, concluding that it is “simply unfair and unreasonable to impose the burden of supporting the medical care industry solely upon those persons who are most severely injured and therefore most in need of compensation.” Carson v. Maurer, 120 N.H. 925, 424 A.2d 825, 837 (1980), overruled on other grounds, Cmty. Res. for Justice, Inc. v. City of Manchester, 154 N.H. 748, 917 A.2d 707, 721 (2007).
Section 766.118, Florida Statutes, has the effect of saving a- modest amount for many by imposing devastating costs on a few — those who are most grievously injured, those who sustain the greatest damage and loss, and multiple claimants for whom judicially determined noneconomic damages are subject to division and reduction simply based upon the existence of the cap. Under the Equal Protection Clause of the Florida Constitution, and guided by our decision in Phillipe, we hold that to reduce damages in this fashion is not only arbitrary, but irrational, and we conclude that it “offends the fundamental notion of equal justice under the law.” Phillipe, 769 So.2d at 972; see also id. at 971 (“Differentiating between a single claimant and multiple claimants bears no rational relationship to the Legislature’s stated goal of alleviating the financial crisis in the medical liability insurance industry.”).
Our holding today is not inconsistent •with the decisions in Samples v. Florida Birth-Related Neurological Injury Compensation Ass’n, 114 So.3d 912 (Fla.2013), Mizrahi v. North Miami Medical Center, 761 So.2d 1040 (Fla.2000), or University of Miami v. Echarte, 618 So.2d 189 (Fla. 1993), because a review of those cases reveals that they involved statutes or challenges which are distinguishable from the present challenge to section 766.118. In Samples, the statute at issue created funding and authorized a $100,000 award to parents under the Florida Birth-Related Neurological Injury Compensation Plan (the Plan), which was structured with other benefits and provided compensation without regard to fault for birth-related neurological injury claims. 114 So.3d at 914-15; see also § 766.303, Fla. Stat. (2013). In rejecting an equal protection challenge on the basis that the statute treats a parent who files for the $100,000 award alone differently than parents who share or divide the award, this Court distinguished the decision in Phillipe, upon which we rely today:
Whereas the provision of the Medical Malpractice Act at issue in [Phillipe ] expressly concerns fault-based noneco-nomic damages for survivors of the deceased, the Plan at issue here establishes a system of no-fault compensation. The no-fault character of the Plan sets the parental award provision apart from the statutory limitation on fault-based damages at issue in [Phillipe ]. Limitations on damages that raise equal protection concerns under a fault-based system are dissimilar and appropriately viewed differently than limitations on compensation under a system where eligible claimants are assured of a recovery without regard to fault.
114 So.3d at 919. Here, as in Phillipe, section 766.118 concerns the award of damages in a traditional fault-based action. Further, section 766.118 arbitrarily reduces damages without regard to the fault of a tortfeasor simply based upon the number of survivors who are entitled to recovery. This is clearly distinguishable from the no-fault compensation award under the Plan at issue in Samples. The Plan *904 was created by the Florida Legislature with the express purpose of “providing compensation, irrespective of fault, for birth-related neurological injury claims.” § 766.303(1), Fla. Stat. (2013) (emphasis supplied). We reiterate that the present case does not involve a statutorily-created no-fault compensation plan. Thus, the two statutory schemes are, quite simply, completely different and distinct. Accordingly, Samples is distinguishable from the present case and, contrary to the assertion of the dissent, does not control, or even inform, the outcome here.
Mizrahi involved a statute that precluded adult children of wrongful death victims from recovering noneconomic damages where the cause of death was medical malpractice. 761 So.2d at 1041. In rejecting an equal protection challenge, we noted that under the common law an adult who was not dependant on a parent had no action and could not recover damages for injuries to that parent. Id. at 1042 (quoting Stewart v. Price, 718 So.2d 205, 209 (Fla. 1st DCA 1998)). When the Legislature created the right for adult children to recover damages for the injuries and wrongful death of a parent, it chose to exclude those children from recovering noneconomic damages in one type of action (medical malpractice). Id. We ultimately held that the statute, “which created a right of action for many while excluding a specific class from such action, and which exclusion is rationally related to controlling healthcare costs and accessibility,” did not violate equal protection. Id. at 1043.
Unlike Mizrahi, the statute under review here does not address and expand a class of individuals eligible to recover non-economic wrongful death damages. Instead, it treats similarly situated, eligible survivors differently by reducing the damages awarded without regard to the fault of the wrongdoer and based solely upon a completely arbitrary factor, i.e., how many survivors are entitled to recovery. The greater the number of survivors who are eligible to recover noneconomic damages in a medical malpractice wrongful death action, the lesser the award that each individual survivor will receive. Thus, the statute at issue in Mizrahi is also distinguishable from the noneconomic damages caps in section 766.118.
Finally, in Echarte this Court considered whether a $250,000 cap on noneconomic damages for medical malpractice claims where a party requested arbitration violated the access to courts provision of the Florida Constitution. 618 So.2d at 190, 193. In the present case, because we address only an equal protection challenge— not an access to courts challenge — Echarte is inapposite. Nevertheless, the holding in Echarte that the cap was constitutional does not impact our decision today. In upholding the constitutionality of the cap in medical malpractice arbitration proceedings, this Court in Echarte noted that arbitration provided commensurate benefits in exchange for the cap, such as saving the expense of attorney fees and expert witnesses. Id. at 194. Conversely, under section 766.118, survivors receive absolutely no benefit whatsoever from the cap on noneconomic damages, but only arbitrary reductions based upon the number of survivors.
Moreover, the statute imposing the cap in Echarte was later addressed by this Court in Phillipe. In Phillipe, we held that the cap applied per claimant rather than per incident, and noted that to hold otherwise would create equal protection concerns. 769 So.2d at 971. In reaching this conclusion, we expressly stated that “Echarte does not control our decision.” Id. Similarly, Echarte does not compel a different result here. Rather, Phillipe, which recognized that Echarte did not ad *905 dress a circumstance in which similarly situated survivors would receive different, arbitrarily reduced noneconomic damage awards solely based upon the number of survivors, is the decision which guides our analysis as to the constitutionality of section 766.118. See Phillipe, 769 So.2d at 971 (noting that “the loss of a survivor is not diminished by the mere fact that there are multiple survivors”).
Despite our discussion of Phillipe, we emphasize that, contrary to the assertion in the concurring in result opinion, our examination of the validity of section 766.118 cannot simply conclude without further analysis. The statute at issue in Phillipe, related to damage limits, is not identical to the factors in the present case. Phillipe involved a very different statutory scheme, based upon noneconomic damage awards in the arbitration context, a factual scenario not presented here. Therefore, while Phillipe provides guidance and may be considered persuasive, it is not disposi-tive of our equal protection analysis today. We cannot take the drastic step of invalidating a statute simply by declaring it so and relying upon an unrelated case which evaluated an unrelated statute. Instead, a comprehensive equal protection analysis of the cap on damages in section 766.118 is required under Florida law to resolve the certified question. Accordingly, a description of the elements of an equal protection review, and our evaluation of those elements, must follow. This is a consideration of the facts and circumstances surrounding the challenged statute and the subject matter it addresses.
The Alleged Medical Malpractice Crisis
In addition to arbitrary and invidious discrimination between medical malpractice claimants, the cap on noneconomic damages also violates the Equal Protection Clause of the Florida Constitution because it bears no rational relationship to a legitimate state objective, thereby failing the rational basis test. See Fla. Nurses Ass’n, 508 So.2d at 819. Although the concurring in result opinion seeks to avoid a full proper legal analysis, contrary to the view of that opinion, no single prior case provides a complete answer and none provides any legal analysis which affords a basis for an answer to the question we must address. Our precedent expressly states that a proper equal protection analysis under the rational basis test “requires this Court to determine: (1) whether the challenged statute serves a legitimate governmental purpose, and (2) whether it was reasonable for the Legislature to believe that the challenged classification would promote that purpose.” Warren v. State Farm, Mut. Auto. Ins. Co., 899 So.2d 1090, 1095 (Fla.2005) (emphasis supplied); see also Zapo v. Gilreath, 779 So.2d 651, 655 (Fla. 5th DCA 2001); Fla. Dept. of Ins. v. Keys Title & Abstract Co., 741 So.2d 599, 602 (Fla. 1st DCA 1999). Thus, under Warren, and contrary to the view of the concurring in result opinion, both prongs of the rational basis test must be evaluated to determine the constitutionality of a statute.
Despite this precedent, the concurring in result opinion loudly proclaims that the full rational basis test be ignored and the legitimacy of the purpose for the cap not be addressed as part of our constitutional analysis. Further, that concurring in result opinion argues that only a single decision which does not set forth a proper analysis be applied. However, we would abandon our obligation under Warren were we to simply rubber stamp the Legislature’s asserted justification for the cap — as the concurring in result and dissenting opinions suggest we do — and fail to consider the existing factors and circumstances to determine whether there is legitimacy to that justification. We de- *906 dine to abdicate our responsibility under the law and, therefore, address whether the cap “serves a legitimate governmental purpose” pursuant to the first prong of Warren, 899 So.2d at 1095 (emphasis supplied).
The Florida Legislature attempted to justify the cap on noneconomic damages by claiming that “Florida is in the midst of a medical malpractice insurance crisis of unprecedented magnitude.” Ch.2003-416, § 1, Laws of Fla., at 4035. The Legislature asserted that the increase in medical malpractice liability insurance premiums has resulted in physicians leaving Florida, retiring early from the practice of medicine, or refusing to perform high-risk procedures, thereby limiting the availability of health care. Id.
In enacting the statutory cap on noneco-nomic damages, the Legislature relied heavily on a report prepared by the Governor’s Select Task Force on Healthcare Professional Liability Insurance (Task Force), which concluded that “actual and potential jury awards of noneconomic damages (such as pain and suffering) are a key factor (perhaps the most important factor) behind the unavailability and un-affordability of medical malpractice insurance in Florida.” Report of Governor’s Select Task Force on Healthcare Professional Liability Insurance (Task Force Report) (Jan. 29, 2003), at xvii.
To evaluate the constitutionality of the cap on noneconomic damages imposed by section 766.118, we are not required to accept the findings of the Legislature or the Task Force at face value. Instead:
While courts may defer to legislative statements of policy and fact, courts may do so only when those statements are based on actual findings of fact, and even then courts must conduct their own inquiry:
The general rule is that findings of fact made by the legislature are presumptively correct. However, it is well-recognized that the findings of fact made by the legislature must actually be findings of fact. They are not entitled to the presumption of correctness if they are nothing more than recitations amounting only to conclusions and they are always subject to judicial inquiry.
N. Fla. Women’s Health & Counseling Serv., Inc. v. State, 866 So.2d 612, 627 (Fla.2003) (quoting Moore v. Thompson, 126 So.2d 543, 549 (Fla.1960)) (some emphasis supplied).
Our consideration of the factors and circumstances involved demonstrates that the conclusions reached by the Florida Legislature as to the existence of a medical malpractice crisis are not fully supported by available data. Instead, the alleged interest of health care being unavailable is completely undermined by authoritative government reports. Those government reports have indicated that the numbers of physicians in both metropolitan and non-metropolitan areas have increased. For example, in a 2003 report, the United States General Accounting Office found that from 1991 to 2001, Florida’s physician supply per 100,000 people grew from 214 to 237 in metropolitan areas and from 98 to 117 in nonmetropolitan areas, or percentage increases of 10.7 and 19, respectively. Physician Workforce: Physician Supply Increased in Metropolitan and Nonmetropolitan Areas but Geographic Disparities Persisted, No. GAO-04-124, (Oct. 31, 2003), at 23, available at http:// www.gao.gov/new.items/d04124.pdf. Thus, during this purported crisis, the numbers of physicians in Florida were actually increasing, not decreasing.
Additionally, an analysis of claim activity certainly does not provide a rational basis *907 for the clear discrimination presented by the legislation. Although assertions of a malpractice insurance crisis are often accompanied by images of runaway juries entering verdicts in exorbitant amounts of noneconomic damages, see, e.g., Task Force Report at xvii, one study revealed that in Florida cases which resulted in payments of $1 million or more over a fourteen-year period, only 7.5 percent involved a jury trial verdict. See Neil Vid-mar, Kara MacKillop & Paul Lee, Million Dollar Medical Malpractice Cases in Florida: Postr-Verdict and Pre-Suit Settlements, 59 Vand. L.Rev. 1348, 1345-46 (2006).[5] Moreover, 10.1 percent of settlements that involved payments of $1 million or more were resolved without a legal action ever being filed. Id. at 1360. Such statistics led the authors of the study to conclude that jury trials constitute only a very small portion of medical malpractice payments. Id. at 1345. The authors also concluded that “tort reform efforts focused on jury verdicts are misdirected, at least with respect to $1 million verdicts in Florida. Not only do jury trials constitute only a small portion of $1 million payments, [but] the settlements following verdicts tend to be substantially less than the jury awards.” Id. at 1381 (emphasis supplied).[6] Thus, available data indicates the Task Force’s finding that noneconomic damage awards by juries are a primary cause of the purported medical malpractice crisis in Florida is most questionable.
Even the Task Force whose report was relied upon by the Florida Legislature employed extremely equivocal language and speculation when describing the existence of a crisis. For example, the Task Force stated that it “believes” the alleged crisis “could get worse in the coming years.... Medical malpractice insurance premiums may become unaffordable, and/or coverage may become unavailable at any price to many physicians and hospitals.” See Task Force Report, at 211-12 (emphasis supplied). Further, despite blaming “actual and potential jury awards of noneconomic damages” for this ominous prediction, Task Force Report at xvii, the Task Force recognized that there are other explanations for the dramatic rise in medical malpractice insurance premiums. For example, the Task Force Report notes that in the opinion of Joanne Doroshow, Executive Director of the Center for Justice and Democracy:
[T]his so-called “crisis” is nothing more than the underwriting cycle of the insurance industry, and driven by the same factors that caused the “crises” in the 1970s and 1980s. According to ... Do-roshow, with each crisis, there has been a severe drop in the investment income for insurers, which has been compounded by sever [sic] under-pricing of insurance premiums in the prior years.... [D]uring years of high interest rates or excellent insurer profits that are invested for maximum return, the insurance companies engage in fierce competition for premium dollars by selling under-priced premiums and insuring very poor risks. Then ... when investment in *908 come drops, either due to increases in interest rates or the stock market, or due to low income resulting from unbearably low premiums, the insurance industry responds by sharply increasing premiums and reducing, coverage.
... The tort reform changes in the 1980s had nothing to do with the flattening of rates. The flattening was caused instead by modulations in the insurance cycle throughout the country.
Task Force Report, at 64 (footnotes omitted). The Task Force itself acknowledged:
Medical malpractice insurance has been subject to sudden jolts, both in availability of coverage and cost. An entire cycle has been defined as the period of years in which insurer underwriting profits cycle from above average to below average. These cycles have always occurred in the insurance industry, particularly in medical malpractice insurance.
Task Force Report, at 81 (emphasis supplied) (footnotes omitted). See also Tom Baker, The Medioal MalpRACTice Myth 53-54 (2005) (“[T]he two most recent medical liability insurance crises did not result from sudden or dramatic increases in medical malpractice settlements or jury verdicts .... [T]he crises resulted from dramatic increases in the amount of money that the insurance industry put in reserve for claims. Those reserve increases were so big because the insurance industry systematically underreserved in the years leading up to the crisis.”).
Finally, testimony before the Senate Judiciary Committee and debate within the Florida Senate raised questions concerning the magnitude of any purported health care crisis. With regard to the former, the deputy director of the Florida Office of Insurance Regulation testified he had found no evidence to suggest that there had been a large increase in the number of frivolous lawsuits filed in Florida, nor was there any evidence of excessive jury verdicts in the prior three years. Testimony of Steve Roddenberry, Senate Judiciary Committee Meeting, July 14, 2003, at 3,10.
During the subsequent floor debate, the following dialogue occurred between a senator and the Chairman of the Senate Judiciary Committee:
SENATOR: Were you able to determine whether or not there is an access to health care crisis in terms of the number of doctors licensed to practice medicine, the number of hospital closures or the number of emergency rooms closed?
[[Image here]]
CHAIRMAN: [T]his is not what I found. What the testimony was from both the Department of Health, the Agency for Health Care Administration and various other people ... was that there, in fact, are more doctors licensed to practice today in the State of Florida than there were five years ago.
Applications to the medical schools in the State of Florida are up and have been up consistently for the past, for the past number of years.
And also that emergency rooms have not been closing as a result of medical malpractice.
As a matter of fact, the Department of Health and the Agency for Health Care Administration both testified under oath that they could not cite any incidents where because of a medical malpractice crisis patients were denied some type of care or directed someplace else.
Senate Floor Debate Tr. 22-23 (Aug. 13, 2003) (emphasis supplied). Further support for the testimony of the committee chairman exists in a report prepared by the United States General Accounting Office, which states:
*909 ' Reports of physician departures in Florida were anecdotal, not extensive, and in some cases we determined them to be inaccurate. For example, state medical society officials told us that Collier and Lee counties lost all of their neurosurgeons due to malpractice concerns; however, we found at least five neurosurgeons currently practicing in each county as of April 2003. Provider groups also reported that malpractice pressures have recently made it difficult for Florida to recruit or retain physicians of any type; however, over the past 2 years the number of new medical licenses issued has increased and physicians per capita has remained unchanged.
Medical Malpractice: Implications of Rising Premiums on Access to Health Care, No. GAO-03-836, (Aug. 2003), at 17-18, available at http://www.gao.gov/new.items/ d03836.pdf.
Moreover, for those doctors who are leaving or have left Florida, there was no concrete evidence to demonstrate that high malpractice premiums were the cause of that departure. During her testimony before the Senate Judiciary Committee, the CEO of the Florida Medical Association testified with regard to two cases where physicians had relocated from Florida to North Carolina and New York, after which the following testimony ensued:
SENATOR: The [American Medical Association] has identified the states with national [crises], medical malpractice. One of the states is North Carolina. One of the states is New York. So it seems like you get some physicians that are leaving Florida for states that are also considered by the AMA to be in national crisis. Why?
CEO: Maybe they haven’t figured that out yet.
CHAIRMAN: You better call the guy from North Carolina and—
CEO: I haven’t got the answer to that. I haven’t talked to any of these people individually.
CHAIRMAN: You better call the guy from North Carolina and tell him they don’t have caps there either.
Testimony of Sandra Mortham, Senate Judiciary Committee Meeting, July 14, 2003, at 117,129-30.
Based upon these statements and reports, although medical malpractice premiums in Florida were undoubtably high in 2003, we conclude the Legislature’s determination that “the increase in medical malpractice liability insurance rates is forcing physicians to practice medicine without professional liability insurance, to leave Florida, to not perform high-risk procedures, or to retire early from the practice of medicine” is unsupported. Ch.2003-416, § 1, Laws of Fla., at 4035. Thus, the finding by the Legislature and the Task Force that Florida was in the midst of a bona fide medical malpractice crisis, threatening the access of Floridians to health care, is dubious and questionable at the very best.
The Impact of Damage Caps on the Alleged Crisis
Even if these conclusions by the Legislature are assumed to be true, and Florida was facing a dangerous risk of physician shortage due to malpractice premiums, we conclude that section 766.118 still violates Florida’s Equal Protection Clause because the available evidence fails to establish a rational relationship between a cap on non-economic damages and alleviation of the purported crisis. See generally Fla. Nurses Ass’n, 508 So.2d at 319 (stating that for legislation to be constitutional under the rational basis standard, it must bear a rational and reasonable relationship to a legitimate state objective).
*910 Reports have failed to establish a direct correlation between damages caps and reduced malpractice premiums. Weiss Ratings, which evaluates the performance of the malpractice insurance industry, has detailed two particularly salient findings. First, based upon data acquired from 1991 until 2002, the median medical malpractice premiums paid by physicians in three high — risk specialties — internal medicine, general surgery, and obstetrics/gynecology — rose by 48.2 percent in states that have damages caps, but in states without caps, the median annual premium increased at a slower rate — by 35.9 percent. Martin D. Weiss, Melissa Gannon & Stephanie Eakins, Medical Malpractice Caps: The Impact of Notv-Economic Damage Caps on Physician Premiums, Claims Payout Levels, and Availability of Coverage, at 7-8 (rev. ed. June 8, 2003), available at http://www.weissratings.com/pdf/ malpractice.pdf. Second, the study noted that among states with caps on damages, only 10.5 percent (two of nineteen states with caps) experienced static or declining medical malpractice premium rates following the imposition of caps. In contrast, among states without damages caps, 18.7 percent (six of thirty-two states[7] without caps) experienced static or declining medical malpractice premiums. Id. at 8.
Additionally, Robert White, the President of First Professionals Insurance Company (FPIC), testified during a Senate Judiciary Committee meeting that a $500,000 cap on noneconomic damages would achieve “virtually nothing” with regard to stabilizing medical malpractice insurance rates. Testimony of Robert White, Senate Judiciary Committee Meeting, July 14, 2003, at 48, 50-51. Earlier in 2003, Mr. White informed a group of Palm Beach physicians: “No responsible insurer can cut its rates after a bill [that caps noneconomic damages at $250,000] passes.” Phil Galewitz, “Underwriter Gives Doctors Dose of Reality,” Palm Beach Post, Jan. 29, 2003, at 1A. Mr. White advised that “[e]ven if a cap is approved by the legislature and survives the likely legal challenge ... it would yield on average only a 16 percent premium cut.” Id. (emphasis supplied). Interestingly, during his testimony before the Senate Judiciary Committee, Mr. White acknowledged that in 2002, the experience of FPIC was more positive in Florida than in Missouri, a state which at that time had implemented caps on damages. Testimony of Robert White, Senate Judiciary Committee Meeting, at 59.
Members of the Florida Senate and the House of Representatives also expressed doubt as to whether a noneconomic damages cap would have the effect of reducing premiums. During floor debate in the Senate, the following dialogue between a senator and the Chairman of the Senate Judiciary Committee occurred:
SENATOR: [W]as there any testimony from either FPIC or any other insurance company that may have testified ... that they would immediately reduce rates if they got a cap on damages?
SENATE PRESIDENT: [Chairman] to respond.
CHAIRMAN: No.
[[Image here]]
SENATOR: Was there any testimony the only way that you could reduce malpractice premiums was to cap damages?
SENATE PRESIDENT: [Chairman to respond.]
CHAIRMAN: No.
*911 [[Image here]]
SENATOR: ... It’s my recollection, and maybe this might help [the Chairman], I remember a Mr. Bob White, representing FPIC, in testimony relative to the caps said, no, there wouldn’t be an immediate reduction in medical malpractice premiums due to caps, but as soon as they would be affirmed by a Court, there would be an immediate reduction available.
[[Image here]]
CHAIRMAN: Senator ... that was not the testimony given by Mr. White. I believe he said that bad faith and a series of other things had to be there, so the answer is no, it was not by placing a $250,000 cap that would give a reduction.
[[Image here]]
[T]he question was very specific, whether or not caps, whether or not Mr. White said that caps would reduce insurance rates. That was the question.
The answer is, he said no. I have the transcripts on my desk, and if you would care to show me where it says otherwise, I would be happy to say so.
[[Image here]]
What he did say was you have to add several variables, bad faith is one of them and I believe there were others. So if the question is on caps, the answer is no.
Senate Floor Debate Tr. 45-47, 49 (Aug. 13, 2003). Further, during floor debate in the House of Representatives, one representative expressed concern that if the Florida Legislature implements a cap on noneconomic damages, there is no requirement in the bill that insurers pass any savings onto physicians. House Floor Debate Tr. 38-39 (Aug. 13, 2003) (“[A]t the end of the day, actually, [the insurance companies] don’t have to pay anything back to the doctors. It’s just a windfall, and there’s no provision in the bill that says otherwise.”).
The concerns of that representative were very perceptive and were not unfounded. While the cap on noneconomic damages limits the amount of money that insurance companies must pay injured victims of medical malpractice, section 766.118 does not require insurance companies to use the acquired savings to lower malpractice insurance premiums for physicians, and the argument and reliance by the Respondent on rate reduction statutes is misplaced. When the statutory cap on noneconomic damages was first enacted, the legislation contained a provision, codified at section 627.062(8)(a)l., Florida Statutes (2003), that simply required the Florida Office of Insurance Regulation (FLOIR) to calculate a “presumed factor that reflects the impact that the changes contained in such legislation will have on rates for medical malpractice insurance and shall issue a notice informing all insurers writing medical malpractice coverage of such presumed factor.” Ch. 2003-416 § 40, Laws of Fla, at 4078. There was no mandated rate reduction. After FLOIR issued a notice of the presumed factor, all medical malpractice insurance companies that offered coverage in Florida were directed to submit a rate filing for medical malpractice insurance that reflected “an overall rate reduction at least as great as the presumed factor.” § 627.062(8)(a)2., Fla. Stat. (2003).
Although at first glance this statutory subsection may appear to compel medical malpractice insurance companies to reduce their rates in response to the 2003 legislation, FLOIR nonetheless advised that “[e]ven after application of the presumed factor, we anticipate insurers will file for rate increases.” Press Release, Florida Office of Insurance Regulation, Office of Insurance Regulation Releases *912 Presumed Factor (Nov. 10, 2003), available at http://www.floir.com/Press Releases/viewmediarelease.aspx?id=1316. Moreover, despite any intended moderation of medical malpractice premiums based upon the calculation of the presumed factor, the 2013 Annual Report on Medical Malpractice Financial Information, Closed Claim Database and Rate Filings, prepared by FLOIR compared the premiums of Florida doctors in four specialties (family practice, obstetrics, emergency, and orthopedics) with other sampled states and concluded that “Florida is either the highest (of nine states) or the second highest state as far as premiums go in all but one of the scenarios.” 2013 FLOIR Annual Report (Oct. 1, 2013) at 57-58, available at http://www.floir.com/ Office/DataReports.aspx#rec (CY2012). Therefore, despite assertions that the presumed factor created in section 627.062(8)(a) caused massive rate reductions by medical malpractice insurers to pass savings, .onto their customers, the data suggests otherwise. Subdivision (8) was even repealed from section 627.062 in 2011, having been designated “obsolete” by the Legislature. Ch.2011-39, § 12, Laws of Fla., at 514, 536-37.
A number of state courts have expressed concern that without a statutory mandate that insurance companies lower their insurance premiums in response to tort reform, the savings resulting from reforms such as damages caps may simply increase insurance company profits. In Zeier v. Zimmer, Inc., 152 P.3d 861 (Okla.2006), the Oklahoma Supreme Court held that a statute requiring a medical malpractice claimant to obtain an affidavit of merit from a qualified expert as a prerequisite to filing an action was unconstitutional under the Oklahoma Constitution. See id. at 874. While Zeier did not address caps, we find an observation of the Oklahoma Supreme Court to be just as applicable to caps on noneconomic damages:
[An] unanticipated result of statutes similar to Oklahoma’s scheme has been the creation of a windfall for insurance companies ... which are not required to implement post-tort reform rates decreasing the cost of medical malpractice insurance to physicians. These companies happily pay less out in tort-reform states while continuing to collect higher premiums from doctors.
Id. at 869-70 (footnote omitted).
Moreover, the Texas Supreme Court has strongly questioned whether caps on damages will lower insurance premiums. In Lucas v. United States, 757 S.W.2d 687 (Tex.1988), the court noted that when the Texas Legislature enacted medical malpractice damages caps, it stated that “adoption of certain modifications in the medical, insurance, and legal systems ... may or may not have an effect on the rates charged by insurers for medical professional liability coverage.” Id. at 691. In striking down the caps as unconstitutional, the court concluded that “[i]n the context of persons catastrophically injured by medical negligence, we believe it is unreasonable and arbitrary to limit their recovery in a speculative experiment to determine whether liability insurance rates will decrease.” Id. We completely agree with and adopt the position of the Supreme Court of Texas.
We conclude that the record and available data fail to establish a legitimate relationship between the cap on wrongful death noneconomic damages and the lowering of medical malpractice insurance premiums. Accordingly, we hold that section 766.118 fails the rational basis test and violates the Equal Protection Clause of the Florida Constitution. See generally Fla. Nurses Ass’n, 508 So.2d at 319.
*913 The Current Status of Medical Malpractice in Florida
Lastly, even if a “crisis” existed when section 766.118 was enacted, a crisis is not a permanent condition. Conditions can change, which remove or negate the justification for a law, transforming what may have once been reasonable into arbitrary and irrational legislation. The United States Supreme Court has recognized that “[a] law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed.” Chastleton Corp. v. Sinclair, 264 U.S. 543, 547-48, 44 S.Ct. 405, 68 L.Ed. 841 (1924). See also Ferdon ex rel. Petrucelli v. Wisconsin Patients Comp. Fund, 284 Wis.2d 573, 701 N.W.2d 440, 468 (2005) (“A statute may be constitutionally valid when enacted but may become constitutionally invalid because of changes in the conditions to which the statute applies. A past crisis does not forever render a law valid.” (footnotes omitted)). Thus, even if section 766.118 may have been rational when it was enacted based on information that was available at the time, it will no longer be rational where the factual premise upon which the statute was based has changed. It is for this reason that Florida courts consider both pre- and post-enactment data in assessing the continued rationality of a statute.
Having evaluated current data, we conclude that no rational basis exists to justify continued application of the noneconomic damages cap of section 766.118. The 2011 State Physician Workforce Data Book prepared by the Association of American Medical Colleges (AAMC) reflects that in 2010, there were 254.8 active physicians for every 100,000 people in Florida, a number higher than twenty-eight other states. AAMC, 2011 State Physician Workforce Data Book, at 9 (Nov. 2011), available at https://www.aamc.org/download/263512/ data/statedata2011.pdf. Further, data collected through December 31, 2010, reflects that 59.4 percent of active physicians who completed medical school in Florida are practicing in Florida. Id. at 53. Only three other states retained a higher percentage of medical students. Id.
Additionally, the Office of the State Courts Administrator (OSCA) reports that medical malpractice filings in Florida have decreased significantly. During fiscal year 2003-04, a total of 5,829 professional malpractice and product liability actions were filed in Florida circuit courts, comprising 3.2 percent of all civil actions filed that year.[8] However, during fiscal year 2011-12, only 2,313 such actions were filed in Florida circuit courts, a decrease of more than 60 percent, and comprising just 0.76 percent of all civil actions filed. The Annual Reports on Medical Malpractice Financial Information prepared by the Florida Office of Insurance Regulation (FLOIR Annual Report) reflect a similar decrease in both the number of claims and in the amount of noneconomic damages paid by medical malpractice insurance companies. For example, 3,574 medical malpractice claims were closed in 2004, and insurance companies paid $195,132,457 in noneco-nomic damages. 2005 FLOIR Annual Report (Oct. 1, 2005) at 40, 44, available at http://www.floir.com/Office/DataReports. aspx#rec (CY2004). On the other hand, in 2012 only 2,491 medical malpractice claims were closed, and insurance companies paid $140,941,965 in noneconomic damages, decreases of 30.3 percent and 27.7 percent, respectively. 2013 FLOIR Annual Report (Oct. 1, 2013) at 10, 88, available at http:// *914 www.floir.com/Office/DataReports. aspx#rec (CY2012).
Finally, and perhaps most telling, is that the leading companies selling medical malpractice insurance in Florida are far from struggling financially. The 2013 FLOIR Annual Report notes:
It is estimated that the Florida medical malpractice line of business standing alone generated a direct (before reinsurance) return on surplus of 14.0% in 2012. This return compares very positively with the average countrywide all-lines net return on surplus for Florida’s leading medical malpractice writers of 5.3% (down from 7.1% in 2011, but not far out of line with market returns in 2012). This represents the ninth consecutive year of profitability. ... Related financial information in the report also suggests that the leading malpractice carriers as a class are financially strong.
2013 FLOIR Annual Report at 8-9 (emphasis supplied). The most recent records and reports of the Florida Office of Insurance Regulation, and the annual reports of medical malpractice insurers, confirm that not only has the number of insurers providing medical malpractice insurance coverage increased, see 2012 FLOIR Annual Report at 40 — 41 and 2013 FLOIR Annual Report at 44, the profits would probably shock most concerned. Indeed, between the years of 2003 and 2010, four insurance companies that offered medical malpractice insurance in Florida cumulatively reported an increase in their net income of more than J/.300 percent,[9] With such impressive net income estimates, the insurance industry should pass savings onto Florida physicians in the form of reduced malpractice insurance premiums,[10] and it should no longer be necessary to continue punishing those most seriously injured by medical negligence by limiting their non-economic recovery to a fixed, arbitrary amount.
Thus, even if there had been a medical malpractice crisis in Florida at the turn of the century, the current data reflects that it has subsided. No rational basis currently exists (if it ever existed) between the cap imposed by section 766.118 and any legitimate state purpose. See generally Fla. Nurses Ass’n, 508 So.2d at 319. At the present time, the cap on noneconomic damages serves no purpose other than to arbitrarily punish the most grievously in *915 jured or their surviving family members. Moreover, it has never been demonstrated that there was a proper predicate for imposing the burden of supporting the Florida legislative scheme upon the shoulders of the persons and families who have been most severely injured and died as a result of medical negligence. Health care policy that relies upon discrimination against Florida families is not rational or reasonable when it attempts to utilize aggregate caps to create unreasonable classifications. Accordingly, and for each of these reasons, the cap on wrongful death noneconomic damages in medical malpractice actions does not pass constitutional muster.
THE REMAINING CERTIFIED QUESTIONS
We conclude that the remaining certified questions need not be addressed. With regard to the second and third questions, the provision of the Florida Constitution that governs access to courts protects those rights which existed either at common law or by statute prior to the adoption of the 1968 Declaration of Rights. See Kluger v. White, 281 So.2d 1, 4 (Fla.1973). Similarly, the right to trial by jury is guaranteed only in those cases where the right was enjoyed at the time the first Constitution of Florida became effective in 1845. In re 1978 Chevrolet Van, 493 So.2d 433, 434 (Fla.1986).
At common law, Florida did not recognize a cause of action for wrongful death. White v. Clayton, 323 So.2d 573, 575 (Fla.1975) (“An action for wrongful death was not authorized at common law, and is a creation of the legislature.”). Moreover, although the Florida Legislature authorized an action for wrongful death prior to 1968, see, e.g., § 768.01, Fla. Stat. (1941), the right of survivors to recover noneco-nomic damages, such as pain and suffering, did not become part of Florida statutory law until 1972. Lifemark Hosps. of Fla., Inc. v. Afonso, 4 So.3d 764, 769 (Fla. 3d DCA), cert. denied, 23 So.3d 711 (Fla.2009).
Section 766.118 caps noneconomic damages in both wrongful death medical malpractice actions and personal injury medical malpractice actions where the victim survives. This case involves only a wrongful death medical malpractice action. Because the right of Ms. McCall’s parents and son to recover noneconomic damages for her death did not exist prior to 1972, their access to courts and jury trial challenges to section 766.118 are not cognizable. Accordingly, to answer the second and third questions certified by the federal appellate court with regard to personal injury medical malpractice actions would constitute an advisory opinion, which we are not authorized to provide. Sarasota-Fruitville Drainage Dish v. Certain Lands Within Said Dish, 80 So.2d 335, 336 (Fla.1955) (‘We have repeatedly held that this Court was not authorized to render advisory opinions except in the instances required or authorized by the Constitution”).
Our decision not to answer the fourth certified question addressing the separation of powers challenge is based upon a similar rationale. As previously stated, with regard to wrongful death, the Florida Legislature created a cause of action where none previously existed. Clayton, 323 So.2d at 575. However, section 766.118 addresses both personal injury medical malpractice actions, which previously existed under the common law, Maggio v. Fla. Dep’t of Labor and Emp. Security, 899 So.2d 1074, 1081 n. 5 (Fla.2005) (noting that “unlike causes of action that are solely the creature of statute, medical malpractice actions existed as common law torts”), and wrongful death medical malpractice actions, which are purely a statu *916 tory creation. Were we to answer the fourth certified question, it would constitute, in part, an impermissible advisory opinion. Sarasota-Fruitville, 80 So.2d at 336. For this reason, we decline to do so.
CONCLUSION
Based on the foregoing, we answer the first rephrased certified question in the affirmative and hold that the cap on wrongful death noneconomic damages in section 766.118, Florida Statutes, violates the Equal Protection Clause of the Florida Constitution. We defer answering the remaining certified questions. We return this case to the Eleventh Circuit Court of Appeals.
It is so ordered.
LABARGA, J., concurs.
PARIENTE, J., concurs in result with an opinion, in which QUINCE and PERRY, JJ., concur.
POLSTON, C.J., dissents with an opinion, in which CANADY, J., concurs.

. Under the FTCA, damages are "determined by the law of the State where the tortious act was committed, 28 U.S.C. § 1346(b), ... subject to the limitations that the United States shall not be liable for ‘interest prior to judgment or for punitive damages.’ " Hatahley v. United States, 351 U.S. 173, 182, 76 S.Ct. 745, 100 L.Ed. 1065 (1956) (quoting 28 U.S.C. § 2674).

. The legal analyses for personal injury damages and wrongful death damages are not the same. The present case is exclusively related to wrongful death, and our analysis is limited accordingly.

. Section 766.118 separates the cap on noneconomic damages into two categories, providing different limitations on damages for practitioners and nonpractitioners. See § 766.118(2), (3), Fla. Stat. Section 766.118(3), Florida Statutes, limits noneco-nomic damages for the negligence of non-practitioner defendants. The Petitioners asserted that they were entitled to recover under this subsection as well; however, the federal district court noted that "no evidence at trial singled out a specific non-practitioner for negligent conduct.” McCall, 642 F.3d at 948-49 (quoting Estate of McCall v. United States, 663 F.Supp.2d 1276, 1295 (N.D.Fla.2009)). The federal district court concluded that the Petitioners had failed to establish that Ms. McCall’s death resulted from the negligence of a nonpractitioner, and the Eleventh Circuit affirmed this determination. Id. at 949.

. The Supreme Court of Illinois concluded that the cap violated the special legislation clause of the Illinois Constitution. Best v. Taylor Mach. Works, 179 Ill.2d 367, 228 Ill. Dec. 636, 689 N.E.2d 1057, 1078 (1997). This clause "expressly prohibits the General Assembly from conferring a special benefit or exclusive privilege on a person or a group of persons to the exclusion of others similarly situated.” Id. 228 Ill.Dec. 636, 689 N.E.2d at 1069. The Supreme Court of Illinois noted that special legislation constitutional challenges are generally "judged under the same standards applicable to an equal protection challenge.” Id. 228 Ill.Dec. 636, 689 N.E.2d at 1070-71.

. Further, a national study reflects that from 1991 until 2003, judgments at trial accounted for only 4 percent of all malpractice payments. Amitabh Chandra, Shantanu Nundy, & Seth A. Seabury, The Growth of Physician Medical Malpractice Payments: Evidence From The National Practitioner Data Bank, Health Affairs at W5-240, W5-243 (May 31, 2005), available at http://content.healthaffairs.org/ content/early/2005/05/31/hlthaff.w5.240.full. pdf+html.

. According to the authors, with one exception, cases with verdicts in excess of $4 million settled for, on average, 37 percent less than the verdict. Million Dollar Medical Malpractice Cases in Florida, 59 Vand. L.Rev. at 1380.

. The study states that "the District of Columbia is being referred to as a 'state' since it effectively operates as such with regard to insurance regulation.” Medical Malpractice Caps, at 7 n. 4.

. The OSCA combines these two types of legal actions for statistical purposes.

. The four insurance companies were The Doctors Company, Mag Mutual Insurance Company, ProAssurance Corporation, and First Professionals Insurance Company. Each of the three remaining insurance companies posts its annual reports online. See http://www.thedoctors.com/TDC/Financials/ CON_ID_000780; http://www.magmutual. com/annual-reports; and http://www. proassurance.com/investorrelations/annual report.aspx. In October 2011, the Doctors Company merged with the parent company of FPIC. See http://www.thedoctors.com/TDC/ PressRoom/PressContent/CON_ID_004471. Since FPIC is no longer an independent entity, the 2003 annual report for FPIC is not available on the website for a specific insurance company, but is available at http://www. rocketfinancial.com/IRVault.aspx?fID = 6352&tID = 1002. Every insurance company authorized to conduct business in Florida is required to file an annual statement "of its financial condition, transactions, and affairs” with the Office of Insurance Regulation. Fla. Admin. Code R. 690-137.00 l(2)(a).

. Despite such increases in net income, in 2012 one medical malpractice insurance company nonetheless charged obstetricians in Miami-Dade County more than $190,000 for $1 million of coverage. See 2013 FLOIR Annual Report at 57. The company charged obstetricians in other Florida counties approximately $98,000 for the same coverage. Id. at 58. During 2012, the same company charged orthopedists in Miami-Dade County more than $115,000 for $1 million of coverage, whereas orthopedists in other Florida counties were charged approximately $59,000. Id. at 57-58.