CANADY, J., dissenting. I disagree with the majority’s conclusion that the challenged statutory provisions violate the right to privacy and the right of access to courts protected by the Florida Constitution. I would also réject Weaver’s argument that the statutory provisions unconstitutionally encroach on this Court’s rulemaking authority and constitute a prohibited special law. The First District correctly concluded that the statutory provisions withstood the constitutional challenges made by Weaver. I therefore dissent from the majority’s unwarranted interference with the Legislature’s authority. I. RIGHT TO PRIVACY A. Background and Waiver In its decision below, the district court spent only a brief portion of its analysis addressing the issue of privacy,.and rightfully so. See Weaver v. Myers, 170 So.3d 873, 883 (Fla. 1st DCA 2016). Medical malpractice claimants have no reasonable expectation of privacy in medical information that is relevant to the alleged malpractice—and that is the only information authorized to be discussed under the ex parte amendments. See § 766.1065(1), Fla. Stat. (2013) (requiring presuit “authorization for release of protected health information ... that is potentially relevant to the claim of personal injury or wrongful death”). Consequently, the Legislature did not overstep its bounds in 2013 by autho.rizing ex parte interviews of nonparty treating physicians as part of the presuit, informal discovery process related to medical malpractice actions, given that the interviews are optional on the part of the treating physician and are limited by a relevance standard.[10] Thus, I would affirm the district court’s conclusion that the amendments do not violate the right to privacy. Article I, section 23 of the Florida Constitution provides, in part, that “[ejvery natural person has-the right to be let alone and free from governmental intrusion into the person’s private life except as otherwise provided herein.” Art. I, § 23, Fla. Const. From this language, the majority concludes that a medical malpractice claimant has a constitutional right to prevent a nonparty treating physician from discussing ex parte the claimant’s relevant medical information with certain interested parties. The district court properly focused on the waiver of privacy protections that necessarily accompanies pursuit of medical malpractice claims. Specifically, the district court concluded that “the decedent’s medical condition is at issue” and any privácy rights were waived because “[fit is well-established in Florida and across the country that any privacy rights that might attach to a claimant’s medical information are waived once that information is placed at issue by filing a medical' malpractice claim.” Weaver, 170 So.3d at 883. In doing so, the district court noted that the 2013 amendments do not apply to information that is not potentially relevant-' to the claim. Id. at 883 n.3 (citing § 766.1065(3)0., Fla. Stat.). Consistent with the district court’s analysis, the majority heire recognizes that privacy matters must be analyzed differently in the context of litigation: “We have further recognized that ‘[t]he potential for invasion of privacy is inherent in the litigation process.’ ” Majority op. at 1126 (alteration in original) (quoting Rasmussen v. S. Fla. Blood Serv., Inc., 500 So.2d 533, 535 (Fla. 1987)). And more specifically, the majority recognizes the concept of privacy waiver in medical malpractice actions, noting that “a claimant may necessarily waive privacy rights to the medical information that is relevant to a claim by filing an action.” Majority op., at 1132. Nevertheless, the majority ends up rejecting the ex parte meetings on constitutional privacy grounds based on the notion that the legislation requires the ’claimant to waive the right to privacy in “confidential health information that is not relevant to the claim.” Majority op. át 1132 (emphasis omitted). But nothing in the ex parte amendments authorizes the discussion of irrelevant medical information. Thus, the majority invalidates the ex parte aménd-ments based on speculation and various assumptions, including that members of the legal profession—who are subject to disciplinary review by this Court—-will act outside the law, as well as that members of the medicah community will misunderstand both their- HIPAA[11] restrictions and' the fact that these ex parte 'interviews are optional and limited by a relevance' standard. I strongly disagree with the majority’s decision to do so. Instead of invalidating these statutory provisions based on speculative assumptions that individuals will act outside the scope of the statutory authorization, I would approve the district court’s analysis and affirm the district court’s conclusion that the amendments do not violate the right to privacy.[12] B. Workers’ Compensation Cases The majority’s decision is difficult to reconcile with the fact that ex parte interviews with nonparty treating physicians have long been authorized by Florida statute in the workers’ compensation arena. See § 440.13(4)(c), Fla. Stat. (2017). As with the amendments at issue in this case, the workers’ compensation ex parte interviews are limited by a relevance standard. Id. The First District long ago rejected a constitutional privacy challenge to the ex parte provisions of the workers’ compensation statute. See S & A Plumbing v. Kimes, 756 So.2d 1037, 1042 (Fla. 1st DCA 2000). There is no evidence to suggest that nonparty treating health care providers in the workers’ compensation arena have had difficulty limiting their ex parte interviews to relevant medicál information—and such ex parte interviews have been taking place for decades. And yet the majority here assumes the opposite result in the medical malpractice context and then bases its, constitutional analysis on that speculative as sumption. ,In doing so, the majority seeks to distinguish Rimes and workers’ compensation cases, but the majority’s reasoning is difficult to reconcile with its holding in this case. For example, the majority observes that “[t]he workers’ compensation system is clearly intended to be self-executing, with the resort to adversarial proceedings being undertaken only as a last recourse to resolve intractable disputes,” Majority op. at 1137 (quoting Kimes, 756 So.2d at 1041). The -majority later reiterates that the workers’ compensation system is designed to resolve claims “without resort to a system of litigation.” Majority op. at 1137 (quoting Kimes, 756 So.2d at 1042). And the majority distinguishes “medical malpractice and wrongful death actions” on the basis that those actions “are completely adversarial and traditional actions at law resolved in the judicial branch by Article V courts.” Majority op. at 1137. But the majority’s argument is flawed in at least two respects. First, implicit in the majority’s argument is the premise that workers’ compensation cases only become “adversarial” once a dispute becomes “intractable.” Majority op. at 1137. Such a premise overlooks “the practical realities,” majority op. at 1135, of workplace injury cases and the nature of the competing interests involved in those cases. Indeed, such a premise cannot be reconciled with the facts of Rimes itself, in which the disputed ex parte meeting took place after Rimes’ request for authorization for ankle surgery had been denied and after Rimes had filed his claim. See Kimes, 756 So.2d at 1038-39, 1041, Second, the majority’s argument overlooks that the .ex parte amendments at issue involve a medical malpractice presuit process which this Court.has described as being “intended to promote the .settlement of meritorious claims at an early .stage without the necessity of a full adversarial proceeding.” Williams v. Campagnulo, 588 So.2d 982, 983 (Fla. 1991) (emphasis added). Thus, ex parte interviews with nonparty treating physicians are designed to accomplish the same underlying purpose in both instances—that is, to avoid adversarial proceedings. ; The majority further attempts to distinguish Rimes by concluding “that the- only medical professional to be interviewed was explicitly hired for purposes of workers’ compensation to evaluate the causal connection between the work performed and the injury.” Majority op. at 1138. The majority’s conclusion is problematic in at least three respects. First, in reaching its conclusion, the majority misreads Rimes and oversimplifies the workers’ compensation process. As is clear from Rimes, the disputed ex parte interview took place “between Rimes’ treating physician and representatives of the employer/carrief’s attorney.” Kimes, 756 So.2d. at 1038 (emphasis 'added). The fact that the employer/carrier in workers’ compensation cases generally • selects the treating physician does not alter the. fact that ■ ■the medical professional at issue was Kimes’ treating -physician. A physician who treats an alleged workplace injury is no.-less, of. a “treating physician”, than a physician who treats an alleged medical malpractice injury. Second, it appears the majority’s conclusion is based on the assumption that the medical professional in Kimes was somehow not in possession of irrelevant protected information. But naturally, any treating physician will obtain information from the patient regarding the patient’s medical history and conditions, as well as other information—that is, protected information that may or may not be relevant to establishing a “causal connection between the work performed and the injury.” Majority op. at 1138. That, of course, explains why the Legislature limited the workers’ compensation ex parte meetings by a relevance standard—-just as the Legislature did with the 2013 amendments at issue. Third, as to the majority’s suggestion that the ex parte meeting in Kimes was harmless because- it was designed to assist in establishing a “causal connection” to the injury, majority op. at 1138, the majority overlooks that the purpose of the medical malpractice presuit process is very much the same—that is, to help, defendants and their insurers determine causation and resolve claims. See Cohen v. Dauphinee, 739 So.2d 68, 71 (Fla. 1999) (“[T]he prevailing policy of this state relative to medical malpractice actions is to encourage the early settlement of meritorious claims and to screen out frivolous claims.”). The majority also observes that “the Kimes court even noted that the moment a workers’ compensation claim becomes sufficiently adversarial by appointment of an expert medical advisor, ex parte conferences are no longer permissible.” Majority op. at 1137 n.6 (citing Kimes, 756 So.2d at 1041 (citing Pierre v. Handi Van, Inc., 717 So.2d 1115, 1117 (Fla. 1st DCA 1998))). But Pierre clearly noted that once ah expert medical advisor is appointed, “ex parte discussions with such experts are not appropriate.” Pierre, 717 So.2d at 1117 (emphasis added). And Pierre went on to note that, such meetings were prohibited by. “either party.” Id. Nothing about this conclusion by Pierre supports the majority’s decision here. Again, the amendments at issue contemplate ex parte interviews with nonparty treating physicians—the same fact witnesses to whom the plaintiff already has ex parte access.[13] Finally,'after analyzing Kimes, the majority concludes “that there was no threat of irrelevant information being disclosed in Kimes.” Majority op. at 1138 (emphasis added). The majority reaches this conclusion despite the fact that the parties’ interests in Kimes were clearly adverse to one another, despite the fact that treating physicians in workers’ compensation cases are generally selected not by the injured employee but rather by the employer/carrier, and despite the fact that the treating physician in Kimes—just' like any other treating physician—undoubtedly possessed irrelevant protected medical information. The majority’s reading of Kimes cannot be reconciled with the majority’s conclusion and reasoning in the instant ease. In the end, the majority’s attempts to distinguish Kimes and workers’ compensation cases are logically flawed. And the majority cannot explain why treating physicians—for decades—have had little difficulty adhering to a relevance standard in workers’ compensation ex parte interviews and why those same medical professionals are unable to do so in medical malpractice ex parte interviews. C. This Court’s Ex-Parte-Interview Jurisprudence The majority’s decision is also difficult to reconcile with the fact that this Court has repeatedly addressed the issue of ex párte interviews of nonparty treating physicians in medical malpractice cases and recognized that the underlying confidentiality rights were created by the Legislature. Although the referenced Cases did not address constitutional challenges to. ex parte meetings and are therefore not controlling here, the case law helps to illustrate the overreach by the majority. Despite the majority’s claim to the contrary, a “proper[] and full[] analysis]” of these cases does not support the majority’s holding and conclusions. Majority op. at 1135 (emphasis omitted), In 1984, this Court squarely rejected a medical malpractice plaintiffs attempt to prohibit an ex parte meeting between the defendant health care provider and the plaintiffs treating physician. See Coralluzzo v. Fass, 450 So.2d 858, 859 (Fla. 1984). In doing so, Coralluzzo. recognized that there was no such thing .as physician/patient confidentiality under Florida law at that time. Id. at 859. And Coralluzzo expressly concluded that there was “no reason in law or in equity to” find for the plaintiff and that “[n]o law, statutory or common, prohibits—even by implication— respondents’ actions.” Id. (emphasis added). In other words, there was nothing to prevent the ex parte interview with the nonparty treating physician in the absence of legislative protections. The majority describes this dissent’s depiction of Coralluzzo as “disturbing” and believes that the absence of a constitutional challenge in Coralluzzo renders this dissent’s summary of Coralluzzo “ill-founded.” Majority op. at 1135. But the majority misses the point. As an initial matter, the reason there was no constitutional-challenge in Coralluzzo is because there was no State action involved—there was no statute to even be challenged. Thus, Coral-luzzo concluded that the ex parte meetings were permitted because the Legislature had not acted to prohibit them. In other words, the ex parte meetings could only be prevented by State action. Moreover, as explained below, the majority overlooks that this dissent’s depiction of Coralluzzo is entirely consistent with how this Court itself has unanimously described Coralluz-zo. See Acosta v. Richter, 671 So.2d 149, 150 (Fla. 1996) (noting that Coralluzzo held that “there was no legal impediment to [the] ex parte conversations” (emphasis added)). In 1988, the Legislature responded to Coralluzzo by creating a broad physician/patient confidentiality privilege—a privilege that previously did not exist under Florida law. See, ch. 88-208, § 2, at 1194-96, Laws of Fla. That new statutory privilege also carried with it, among other things, a limited exception for medical malpractice actions. Id. Subsequent to the Legislature’s 1988 statutory amendments, this Court has twice revisited the issue of ex parte meetings with nonparty treating physicians in medical malpractice cases, both times striking down the ex parte meetings on the specific grounds that they were precluded by the' 1988 statutory amendments. See Hasan v. Garvar, 108 So.3d 570, 578 (Fla. 2012); Acosta, 671 So.2d at 156. As with Coralluzzo, neither Hasan nor Acosta supports the conclusion that the Legislature acted unconstitutionally here. In Acosta, this Court began by recognizing that the issue presented “ha[d] its genesis in Coralluzzo.” Acosta, 671 So.2d at 150. In assessing that previous decision, Acosta unanimously explained that -Corah luzzo stood for the proposition that “there was no legal impediment to ex parte conversations between a patient’s treating doctors and the defendants or their representatives.” Id (emphasis added). Thus, this Court in Acosta summarized Coralluz-zo in the exact- same manner that the majority here finds to be “disturbing.” See majority op. at 1135. Acosta then went bn to examine the Legislature’s 1988 statutory amendments and ultimately concluded that those amendments provided the previously missing “legal impediment,” Acosta, 671 So.2d at 150, to prevent medical malpractice defendants from conducting ex parte meetings with plaintiffs’ treating physicians. Specifically, Acosta recognized that the Legislature had “create[d] a physician-patient privilege where none existed before” and had “provide[d] an explicit but limited scheme for the disclosure of personal medical information.” Id. at 154. Acosta went on to reject the proposed ex parte conferences because they did not fall within the statute’s narrow “medical negligence” exception. Id at 156.[14] In other words, Acosta recognized that the Legislature had broadly protected a patient’s medical information and that the Legislature had created “a strict scheme for limited disclosure” which did not include a specific exception for the disclosure of protected information during ex parte conferences with treating physicians. Id. In reaching its holding, Acosta noted that “the legislature has considerable latitude in providing Florida citizens with a high degree of privacy in their medical information.” Id. Similarly, Hasan—which was decided in 2012, shortly before the 2013 statutory amendments at issue in this case—noted that-- the 1988 statutory amendments “broadened the statutory protections for physician-patient confidentiality.” Hasan, 108 So.3d at 573. Arid Hasan- similarly rejected the ex parte meeting because it did not fall within the statute’s “limited, defined exceptions.” Id. at 578. Thus, Acosta and Hasan both recognized that the Legislature had closed the door on ex parte interviews through the 1988 statutory amendments. Despite the clear import of these cases, the majority concludes that the cases “actually support” the majority’s decision in this case. Majority op. at 1136. Moreover, the majority asserts that this dissent has “selective[ly] referenced” the cases and “ignored” those portions which support the majority’s decision. Majority op. at 1136. On the contrary, these cases offer no support to the conclusion that the Legislature is powerless to reauthorize these ex parte meetings. For example, the majority points to certain language from Acosta, which was later reiterated in Hasan, in which this Court rejected the idea of permitting ex parte conferences with treating physicians “so long as the physicians are not required to say anything.” Majority op. at 1136 (quoting Hasan, 108 So.3d at 578 (quoting Acosta, 671 So.2d at 156)). The majority accurately notes that in rejecting that idea,. Acosta concluded that “[w]e believe it is pure sophistry to suggest that the purpose and spirit of the statute would not be violated by such conferences.” Majority op. at 1136-37 (quoting Hasan, 108 So.3d at 578 (quoting Acosta, 671 So.2d at 156)). But this quote from Acosta does not support the majority’s decision here. As -is clear from the plain text of the- quote, Acosta rejected such sham meetings because they would violate “the purpose and spirit of the statute.” Acosta, 671 So.2d at 156 (emphasis added). Again, it was the statute' which protected the information, the statute which established' the “strict scheme for limited disclosure,” id., and the statute which did not include an express exception for the disclosure of protected information during ex parte meetings with treating physicians. Thus, Acosta merely recognized the obvious—that it would have been “pure sophistry,” id., to permit such sham meetings, given that the statute did not permit the discussion of any protected information at such meetings, not even relevant information. Here, the Legislature expressly amended the legislatively created “strict scheme for limited disclosure,” id., so as to specifically allow for the discussion of relevant information at ex parte meetings. The quote from Acosta, when properly analyzed, does not support the majority’s holding. The same is true when Acosta and the other referenced cases are properly analyzed in their entirety. ■ Lastly, in both its general analysis and its attempt to read the referenced case law to support its holding in this case, the majority repeatedly references “strict scrutiny,” “less invasive manner,” and “least intrusive means.” Majority op. at 1135, 1136, 1137. And the majority asserts that this dissent instead “advances the most invasive clandestine secret interrogations as a method to deal with the fundá-mental constitutional right of our citizens.” Majority op. at 1135. But the. majority again misses the point. The issue here is straightforward: whether the Legislature is permitted to once again place medical malpractice defendants on equal footing with plaintiffs with respect to access to an important fact witness. There is no “less restrictive” way to put the defendant on equal footing other than to allow ex parte access by the defendant—the plaintiff, of course, already has ex parte access to that fact, witness. Thus, the basic question is whether the Legislature may, in fact, place the defendant on equal footing. This Court’s case law, beginning with Coralluz-zo, recognizes that prior to the Legislature’s 1988 statutory amendments, medical malpractice defendants had equal ex parte access to nonparty treating physicians. Thus, it stands to reason that the Legislature should very well be’able to restore the equal access that the Legislature itself took away, so long as it does so in a HIPAA-compliant manner. The majority instead concludes that the Legislature has no business doing so. I respectfully disagree with the majority’s analysis and conclusion;[15] D. Conclusion To sum up, the majority here holds it unconstitutional for the Legislature to now authorize optional ex parte meetings which are limited by a relevance standard—even though the Legislature is the same independent branch of government that closed the door on ex parte meetings in the first place and, no Florida case law has ever held that the constitutional right of privacy precludes the ex parte disclosure of information bearing on a malpractice claim. On the contrary, the Legislature was well within its bounds to carve out a limited, HIPAA-compliant exception to a legislatively created right in order to attempt to place plaintiffs and defendants, on a level playing field with respect to access to. certain important nonparty fact witnesses. See, e.g., Callahan v. Bledsoe, No. 16-2310-JAR-GLR, 2017 WL 590264, at *1 (D. Kan. Feb. 14, 2017) (“[T]his District has a well-established practice of allowing informal ex parte interviews of Plaintiffs treating physicians who are merely fact witnesses ,as long as a defendant complies with HIPAA and its related regulations.”); Arons v. Jutkowitz, 9 N.Y.3d 393, 850 N.Y.S.2d 345, 880 N.E.2d 831, 842 (2007) (finding that “there was no basis for” the plaintiffs to decline to sign “HIPAA-compliant authorizations permitting their treating physicians to discuss the medical condition at issue in the litigation with defense counsel,” given that the plaintiffs had “waived the physician-patient privilege as to this information when they brought suit”). In short, medical malpractice claimants waive whatever constitutional privacy rights they may have in relevant medical information. Because the 2013 amendments do not in any way authorize the discussion of irrelevant medical information, medical malpractice claimants have no constitutional right to prevent the ex parte meetings. I would therefore affirm the district court’s conclusion that the ex parte amendments do not violate the right to privacy. Consequently, I would not address the issue of whether a person’s privacy rights survive death. II. ACCESS TO COURTS The district court properly rejected Weaver’s argument that the 2013 ex parte amendments unconstitutionally burden the right to access the courts guaranteed by article I, section 21 of the Florida Constitution. In doing so, the district court examined this Court’s decision in Kluger v. White, 281 So.2d 1 (Fla. 1973), and concluded that the amendments did not “abolish!], eliminate[]; or severely limitf ] a substantive right to redress of a specific injury.” Weaver, 170 So.3d at 882 (emphasis omitted). The district court then examined this Court’s decision in Warren v. State Farm Mutual Automobile Insurance Co., 899 So.2d 1090 (Fla. 2005), and concluded that the amendments authorizing the ex parte interviews were “a reasonable condition precedent to filing.suit,” Weaver, 170 So.3d at 882. tThe district court also observed that the predecessor statute to section 766.106—setting forth the original presuit notice and screening requirements—has previously been upheld against an access to courts challenge. Id. (citing Lindberg v. Hosp. Corp. of Am., 545 So.2d 1384, 1386 (Fla. 4th DCA 1989), approved, 571 So.2d 446 (Fla. 1990)). The majority here instead holds that the amendments violate the right of access to courts under the unconstitutional conditions doctrine. See majority op. at 1139. Specifically, the majority- finds that the amendments “require - Weaver to forfeit the constitutional right to privacy and expose her late husband’s medical and other information (and potentially hers) ... regardless of its relevance to her claim to prying lawyers, insurance companies, experts, and doctors to probe, as a condition to filing a wrongful death action.” Majority op, at 1140. But the ex parte amendments require no such “forfeit[ure].” As- an initial matter, the majority -itself recognizes that any constitutional privacy rights with respect to- relevant information are waived by plaintiffs in medical malpractice actions. See majority op. at 1132. In other words, the ex parte amendments do not establish a plaintiffs waiver of any constitutional privacy rights in relevant information—instead, that waiver is accomplished by the plaintiffs own action in pursuing a malpractice claim. Thus, the majority’s conclusion rests solely on the notion that the amendments “require” plaintiffs to waive their privacy -rights in irrelevant information in order to obtain access to courts. But as noted above, nothing in the 2013 amendments authorizes the discussion of irrelevant medical information. Because the ex parte amendments do not “require” a waiver or forfeiture of any privacy rights that are not already waived by the plaintiffs own action in pursuing a malpractice claim, the amendments cannot be said to unconstitutionally condition a plaintiffs right of access to courts on the waiver of the right to privacy. ■ This Court has repeatedly recognized the legitimacy of the medical malpractice presuit process. See, e.g., Cohen, 739 So.2d at 71-72 (“[T]he prevailing policy of this state relative to medical malpractice actions is to encourage the early settlement of meritorious claims and to screen out frivolous claims.... This policy is best served by the free and open exchange of information during the presuit' screening process.”); Kukral v. Mekras, 679 So.2d 278, 284 (Fla. 1996) (recognizing “the legislative policy of requiring the'parties'to engage in meaningful presuit investigation, discovery and negotiations” and “screening out • frivolous lawsuits and defenses”); Weinstock v. Groth, 629 So.2d 835, 838 (Fla. 1993) (“[T]he purpose of the chapter 766 presuit requirements is to alleviate the high cost of medical negligence claims through early determination and prompt resolution of claims ....”); Williams, 588 So.2d at 983 (noting the “legitimate legislative policy” of “promot[ing] the settlement of meritorious claims at an early stage without the necessity of a full adversarial proceeding”). The 2013 ex parte amendments simply add to that legitimate pre-suit process by “impos[ing] a reasonable condition precedent to filing a [medical malpractice] claim.” Warren, 899 So.2d at 1097. Accordingly, I would affirm the district court’s conclusion that the' amendments do not violate the right of access to courts. III. SEPARATION OF POWERS The district court rejected Weaver’s argument that the 2013 amendments unconstitutionally encroach on this Court’s rule-making authority under article V, section 2(a) of the Florida Constitution. Weaver, 170 So.3d at 880. Specifically, Weaver alleged that the ex parte amendments constitute “a procedural change which imper-missibly conflicts with the limitations on informal discovery methods as outlined by Florida Rule of Civil Procedure 1.650.” H. at 878. In rejecting Weaver’s argument, the district court correctly concluded that the amendments do not conflict with rule 1.650 and “are integral to other substantive portions of the statute.” Id. at 880. Rule 1.650 specifically addresses section 766.106, Florida Statutes, and the medical malpractice presuit notice and screening process. Among other things, the rule sets forth the following three types of infonnal presuit discovery, along with the procedures for conducting same: unsworn statements by parties, production of documents or things, and physical examinations. Fla. R. Civ. P. 1.650(c)(1)-(2). As the district court aptly noted, rule 1.650 was adopted by this Court in .1988 shortly after the enactment of chapter 88-277, § 48, Laws of Florida, in which the Legislature amended the then-existing presuit statute to provide for those same three specific methods of informal presuit discovery.[16] 193, 193 (Fla. 1988). The ex parte amende ments at issue do not conflict with rule 1.650. And in any event, that procedural rule does not operate to prevent the Legislature from making substantive changes to the medical malpractice presuit process, which is exactly what the Legislature did through the ex parte amendments. See Kuhajda v. Borden Dairy Co. of Ala., LLC., 202 So.3d 391, 396 (Fla. 2016) (“A procedural rule should not be strictly con-' strued to defeat a statute it is designed to implement.”); Eenyard v. Wainwright, 322 So.2d 473, 475 (Fla. 1975), (“[T]he statute must prevail over our rule because the subject is substantive law.”). BL oo 09 OO O 1 © m CO g CD* co O i-⅛ ⅛ o <¾ CD Q* a This Court has defined substantive law “as that part of the law which creates, defines, and regulates rights, or that part of the law which courts are established to administer.” Haven Fed. Sav. & Loan Ass’n v. Kirian, 579 So.2d 730, 732 (Fla. 1991). On the other hand, “[procedural law concerns the means and method to apply and enforce those duties and rights.” Benyard, 322 So.2d at 475. This Court has recognized that situations arise in which statutes may contain both substantive and procedural aspects: Of course, statutes at times may not appear to, fall exclusively into either a procedural or substantive classification. We have held that where a statute contains some procedural aspects, but those provisions are so intimately intertwined with the substantive rights created by the statute, that statute will not imper-missibly intrude on the practice and procedure of the courts in a constitutional sense, causing a constitutional challenge to fail. See Caple v. Tuttle’s Design-Build, Inc., 753 So.2d 49, 54 (Fla. 2000); see also State v. Raymond, 906 So.2d 1045, 1049 (Fla. 2005). If a statute is clearly substantive and “operates in an area of legitimate legislative concern,” this Court will not hold that it constitutes an unconstitutional encroachment' on the judicial branch. Caple, 753 So.2d at 53 (quoting VanBibber v. Hartford Accident & Indem. Ins. Co., 439 So.2d 880, 883 (Fla. 1983)). Massey v. David, 979 So.2d 931, 937 (Fla. 2008). Here, the amendments are “clearly substantive and ‘operate[ ] in an area of legitimate legislative concern.’” Id. (quoting Caple, 753 So.2d at 53). And any procedural aspects are merely incidental. Id. As explained above, this Court has concluded that prior to the 1988 statutory amendments, defendants had the right to attempt to meet with plaintiffs’ nonparty treating physicians on an ex parte basis. See Coralluzzo, 450 So.2d at 859. And in the wake of the 1988 statutory amendments, this Court has twice recognized that the Legislature closed the door on those ex parte meetings by creating a broad physician/patient confidentiality privilege with only certain limited exceptions. See Hasan, 108 So.3d at 576-77; Acosta, 671 So.2d at 154. The ex parte amendments at issue thus “regulate,” Kirian, 579 So.2d at 732, legislatively created rights by once again allowing for ex parte meetings—but only under certain circumstances and conditions. And the amendments do so in a medical malpractice area that this Court has recognized involves “legitimate legislative policy.” Williams, 588 So.2d at 983. As the district court recognized, this Court, previously • rejected the argument that the medical malpractice presuit notice requirement violates the separation of powers. Weaver, 170 So.3d at 878-79 (citing Williams, 588 So.2d at 983). Williams, which involved the original medical malpractice presuit notice and reasonable investigation statute enacted in 1985, examined the overall presuit process; noting that “[t]he statute ... established a process intended to promote the settlement of meritorious claims at an early stage without the necessity of a full adversarial proceeding,” Williams, 588 So.2d at 983. And Williams concluded “that .the statute is primarily substantive and that it has been procedurally implemented by our rule 1.650, Florida Rules of Civil Procedure.” Id. Nothing in Williams supports the opposite conclusion here—that is, that the ex parte amendments are procedural'. I would affirm the district court’s conclusion that the ex parte amendments' do not unconstitutionally encroach on this . Court’s rulemaking authority. IV. SPECIAL LAW The district court rejected Weaver’s argument that the 2013 amendments constitute a prohibited special law in violation of' article III, section 11 of the Florida Constitution. In doing so, the district court examined the two factors set forth by this Court in Biscayne Kennel Club, Inc. v. Florida State Racing Commission, 165 So.2d 762, 763-64 (Fla. 1964), for determining whether a law that operates through a classification system is a valid general law. Weaver, 170 So.3d at 881. The district court concluded that the ex parte amendments met those two criteria and thus constituted a valid general law. Id. The district court also rejected Weaver’s argument that this Court’s plurality decision in Estate of McCall v. United States, 134 So.3d 894 (Fla. 2014), compels the conclusion “that medical malpractice plaintiffs now may not be treated differently from, other plaintiffs because no medical malpractice crisis exists.” Weaver,. 170. So.3d at-881. I would affirm the. district court’s conclusion that the 2013 amendments are a valid general law. Article III, section 11(a) of the Florida Constitution prohibits Special laws or general laws of local application pertaining to certain subjects, including “rules of evidence in any court” and “conditions precedent to bringing any civil or criminal proceedings.” Art. III, §§ 11(a)(3), (a)(7), Fla. Const. This Court has explained that “a special law is one relating to, or designed to operate upon, particular persons ór things, or one that purports to operate upon classified persons or things when classification is not permissible or the classification, adopted is illegal.” Dep’t of Bus. Reg. v. Classic, Mile, Inc., 541 So.2d 1155, 1157 (Fla. 1989) (quoting State ex rel. Landis v. Harris, 120. Fla. 555, 163 So. 237, 240 (1934)). On the other hand, a law is general if “it operates uniformly upon subjects as they may exist in the state, applies uniformly within.permissible classifications, operates universally throughout the state or so long as it relates to a state function or instrumentality,” Dep’t of Legal Affairs v. Sanford-Orlando Kennel Club, Inc., 434 So.2d 879, 881 (Fla. 1983). “A general law operates uniformly, not because it operates upon every person in the state, but because every person brought under the law is affected by it in a uniform fashion.” Id. Here, the ex parte amendments involve a legislative classification—medical malpractice claimants and defendants. Thus, the following two factors determine whether that classification is valid: (1) whether the class is “open to others who may enter it”; and (2) whether there is “a rational distinction between those in the class and those outside it, when the purpose of the legislation and the subject of the regulation are considered.” Biscayne Kennel Club, 165 So.2d at 764. The first Biscayne Kennel Club prong is undoubtedly met—the class here is not closed but rather is “open” to all future parties ■ to - medical malpraptice actions. Thus, the only question is whether there is “a rational distinction between those in the class and those outside it, when the purpose of the legislation and the subject of the regulation are considered.” Id The district court correctly concluded that there is such a rational distinction. The ex parte amendments are consistent with decades of precedent finding that it is appropriate to treat medical malpractice claimants and defendants differently than other personal injury claimants and defendants. Medical malpractice is an area that has been historically regulated by the Legislature with the goal of “ensuring the availability of adequate medical care.” Weaver, 170 So.3d at 881. Weaver argues that the ex parte amendments impermissibly treat medical malpractice claimants differently and less favorably than all other personal injury claimants. Weaver also takes issue with the district court’s dismissal of McCall. Specifically, Weaver argues that because the McCall plurality found that no medical malpractice insurance crisis currently ex- ' ists, it was error for the district court below to justify the ex parte amendments by relying on “a decades-old finding” by the Legislature that a medical malpractice crisis existed at the time the presuit process was originally enacted. Weaver’s arguments are not persuasive. As an initial matter, McCall has no application to this case. McCall involved an equal protection challenge to statutory caps on noneconomic damages and had nothing to do with the issue of prohibited special laws. McCall, 134 So.3d at 897. Moreover, any suggestion that a medical malpractice “crisis” must, in fact, exist as a prerequisite for permissible legislative classifications involving medical malpractice parties is unwarranted. A special law inquiry does not involve this Court acting as a- super-legislative body to review the Legislature’s policy decisions. Instead,-as it relates to the second Biscayne Kennel Club prong, the appropriate inquiry is whether there is “a rational distinction between those in the class and those outside it, when the purpose of the legislation and the subject of the regulation are considered.” Biscayne Kennel Club, 165 So.2d at 764 (emphasis added); As to the “subject of the regulation,” id., chapter 766, Florida Statutes, is entitled “Medical Malpractice and Related Matters.” Because the subject being regulated is medical malpractice matters—and not all personal injury tort matters, including thQse unrelated to. medical malpractice—it obviously makes sense that the ex parte amendments classify medical malpractice claimants and defendants differently than other personal injury claimants and defendants. As to the “purpose of the legislation,” Biscayne Kennel Club, 165 So.2d at 764, the district court noted that the presuit notice and investigation statutes “were originally enacted by the Legislature to combat the financial crisis in the medical liability insurance industry by encouraging early settlement and negotiation of claims.” Weaver, 170 So.3d at 881 (citing Univ. of Miami v. Echarte, 618 So.2d 189, 191-92 (Fla. 1993)). In the years since that original enactment, ■ this Court has described the purpose of the presuit process in general terms. Namely, the purpose is to attempt to control “the high cost of medical negligence claims through early determination and prompt resolution of claims,” Weinstock, 629 So.2d at 838, and “promot[ing] the settlement of meritorious claims at an early stage without the necessity of a full adversarial proceeding,” Williams, 588 So.2d at 983. “Indeed, the prevailing policy of this state relative to medical malpractice actions is to encourage the early settlement of meritorious claims.” Cohen, 739 So.2d at 71. And the best way to accomplish that “prevailing policy"’ is through “the free and open exchange of information during the pre-suit screening-process,” id. at 72, and by “requiring the parties to engage in meaningful presuit investigation, discovery and negotiations,” Kukral, 679 So.2d at 284. Providing both sides in a medical malpractice suit with the same pretrial access (potentially) to important nonparty fact witnesses is undoubtedly rationally related to the Legislature’s interest in promoting early settlement and attempting to keep costs down in order to help make Florida an attractive! place for doctors to practice. In other words, the legislative classification here between parties to medical malpractice ' claims and parties to other personal injury tort claims is rational when considering “the purpose of the legislation.” Biscayne Kennel Club, 165 So.2d at 764. This Court recently explained the burden on a party challenging a legislative classification: This Court has held that the law must be upheld unless the Legislature could not have any reasonable ground for believing that there were public considerations justifying the particular classification and distinction made. North Ridge Gen. Hosp., Inc. v. City of Oakland Park, 374 So.2d 461, 465 (Fla. 1979). Further, this Court has held that “one , who assails the. classification has the burden of showing that it is arbitrary and unreasonable.” Id. at 465. The ap-pellees have not met this burden. License Acquisitions, LLC v. Debary Real Estate Holdings, LLC, 155 So.3d 1137, 1149 (Fla. 2014). The issue here is not whether-a medical malpractice “crisis” exists, but rather whether Weaver has shown that “the Legislature could not have had any reasonable ground for believing that there were public considerations justifying the particular classification and distinction made.” North Ridge Gen. Hosp., 374 So.2d at 465 (emphasis added). And Weaver does not come close to meeting this burden. V. CONCLUSION For the reasons explained above, I would affirm the First District’s decision in Weaver. The ex parte amendments do not violate the right to privacy or the right of access to courts protected by the Florida Constitution. And the ex parte amendments do not unconstitutionally encroach on this Court’s rulemaking authority or constitute a prohibited special law. I dissent. POLSTON and LAWSON, JJ., concur. . The .Legislature first enacted a medical malpractice’presuit notice and reasonable investigation requirement in 1985. See ch. 85- ' 175, §§ 12, 14, at 1196-97, 1199-1202, Laws of Fla. In 1988, the Legislature amended the presuit process by imposing a mandatory '‘presuit investigation” requirement and outlining the permissible "informal discovery” to be used by the parties. See ch. 88-1, §§ 48-53, at 164-68, Laws of Fla.; ch. 88-277, § 48, at 1494-95, Laws of Fla, . Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996). . The majority also offers no explanation for why a defendant would even be interested in obtaining protected information "that is totally irrelevant to the claim.” Majority op. at 1133. Any such information would be inadmissible at trial and the discussion of such information would subject the interviewer and interviewee to potential liability and discipline. The majority instead references “the practical realities of today's litigation practice.” Majority op. at 1135. But the majority then fails to identify a single “practical” use that would be served either by a defendant's attempt to obtain "totally irrelevant” protected information or by a medical professional’s willingness to discuss such information. Instead, the referencéd “practical realities” appear to relate to the majority’s belief that attorneys "very often” act inappropriately. Majority op. at 1135. Such a belief, of course, should not guide the majority's constitutional analysis. . In Kimes, an expert medical advisor had not even been appointed at the time of the ex parte conference with the treating physician, See Kimes, 756 So.2d at 1041. And yet it can hardly be argued that the dispute in Kimes was not "adversarial." . The majority suggests that Acosta adopted a quote from Kirkland v. Middleton, 639 So.2d 1002, 1004 (Fla. 5th DCA 1994), which expressed a blanket concern about ex parte interviews and the complete lack of protection to Florida citizens from the disclosure of information "that is totally irrelevant to the claim.” Majority op. at 1133-34. But Acosta quoted Kirkland simply to explain how the district court reached its decision in Kirkland. Acosta, 671 So.2d at 152-53. . The majority also makes reference 'to "the standard discovery procedures with notice and participation, of all parties that are employed daily without issue in thousands of . cases.” Majority op. at 1138 (emphasis added). But the majority then fails to mention that in those “thousands of cases,” plaintiffs and defendants alike are generally permitted to contact fact witnesses on an ex parte basis. Again, the only reason why post-1988 medical malpractice defendants have not had equal ex parte, access to those -fact witnesses Who happen to be nonparty treating physicians is because the Legislature took away that equal access. . Rule 1.650 has not been updated to reflect other permissible methods of informal presuit discovery subsequently authorized by the Legislature, including the taking of unsworn statements from a claimant's treating health care providers and the submission of written questions. See, e.g., ch. 2003-416, § 49, at 65-66, Laws of Fla.