

**E-FILED**
**CNMI SUPREME COURT**
E-filed: Dec 30 2024 03:03PM
Clerk Review: Dec 30 2024 03:04PM
Filing ID: 75332161
Case No.: 2023-SCC-0008-CIV
NoraV Borja



IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

---

ARAYANEE ANN SABLAN MARATITA,
*Plaintiff-Appellant*,

*v.*

COMMONWEALTH HEALTHCARE CORPORATION / COMMONWEALTH
HEALTH CENTER,
*Defendant-Appellee*.

Supreme Court No. 2022-SCC-0020-CIV

---

YVONNE REYES PANGELINAN AS GUARDIAN AD LITEM FOR M.P. (D.O.B.
XXXX 2020), MINOR CHILD, HOPE LEILANI REYES GOMEZ, AND JIMMY POLK,
*Plaintiffs-Appellants*,

*v.*

HELEN TARO-ATALIG, M.D., HEALTH PROFESSIONAL CORPORATION DBA
SAIPAN HEALTH CLINIC, AND COMMONWEALTH HEALTHCARE
CORPORATION / COMMONWEALTH HEALTH CENTER,
*Defendants-Appellees*.

**Supreme Court No. 2023-SCC-0008-CIV**

---

**SLIP OPINION**

**Cite as: 2024 MP 10**

Decided December 30, 2024

---

ASSOCIATE JUSTICE JOHN A. MANGLOÑA
ASSOCIATE JUSTICE PERRY B. INOS
JUSTICE PRO TEMPORE F. PHILIP CARBULLIDO

---

Superior Court Civil Actions No. 22-0095 & 22-0063
Judge Wesley Bogdan, Presiding

---

MANGLOÑA, J.:

¶ 1     Appellants Arayanee Ann Sablan Maratita ("Maratita") and Yvonne Reyes Pangelinan, Hope Leilani Reyes Gomez, and Jimmy Polk (collectively "Pangelinan") separately appeal the dismissals of their equal protection claims against various health professionals and entities, including the Commonwealth Healthcare Corporation ("CHCC"), and ask this Court to find two liability caps unconstitutional. The two cases were consolidated for appellate argument and will be consolidated in this opinion. For the following reasons, we find the trial court incorrectly applied the rational basis test in its analysis of the claims. We further find the Governmental Liability Act's $100,000 damages cap and the Injury Compensation Act's $300,000 non-economic damages cap are unconstitutional. We REVERSE the lower court and REMAND the cases for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY
### A. Factual background for Maratita

¶ 2     In January 2020, a CHCC doctor performed laparoscopic surgery on Maratita to remove her gall bladder. During surgery, Maratita's bile duct was punctured. Afterward, Maratita experienced complications as a result of bile duct fluid leaking into her abdomen. She sought medical treatment in California, but the complications were so severe that she was placed into a coma. She received treatment, eventually coming out of the coma, but she lives with severe and potentially permanent nerve damage. Partially paralyzed, she can no longer use her hands, speak properly, or control her eyes. This condition forced her to move to Hawaii for intensive physical therapy. She estimates her total damages, including medical expenses, to be more than $2,000,000.

¶ 3     Maratita sued CHCC for medical malpractice, negligent hiring, and a violation of her equal protection rights under Article 1, Section 6 of the NMI Constitution by 7 CMC § 2202(a)(1) ("GLA Cap"). CHCC filed a Motion to Dismiss the equal protection claim under Rule 12(b)(6) of the NMI Rules of Civil Procedure. The trial court granted dismissal and certified it as a final judgment under NMI Rule of Civil Procedure 54(b). Maratita timely appealed.

### B. Factual background for Pangelinan

¶ 4     In May 2020, Dr. Helen Taro-Atalig, a private doctor with Saipan Health Clinic, served as the attending doctor at the CHCC-managed hospital for the birth of Hope Leilani Reyes Gomez's and Jimmy Polk's son M.P.. Pangelinan alleges that Saipan Health Clinic and CHCC staff provided substandard medical care at M.P.'s birth, causing him to be diagnosed with Hypoxic Ischemic Encephalopathy, a form of permanent brain damage.

¶ 5     Pangelinan sued Dr. Taro-Atalig, Saipan Health Clinic, and CHCC for medical malpractice and violation of their equal protection rights by both the GLA cap and 7 CMC § 2922 ("ICA Cap"). The defendants moved to dismiss all three claims under Rule 12(b)(6). The trial court denied dismissal of the medical malpractice action and granted dismissal of the equal protection claims under

Rule 54(b). Pangelinan timely appealed the dismissals.

¶ 6     Following a joint motion from Maratita and Pangelinan, the two appeals were consolidated for appellate argument. The Commonwealth entered as Amicus Curiae, represented by the Office of the Attorney General.[1]

## II. JURISDICTION

¶ 7     We have appellate jurisdiction over final judgments and orders of the Commonwealth Superior Court. NMI CONST. art. IV, § 3. The trial court's judgments under Rule 54(b) as to the dismissed claims are final and reviewable. NMI CIV. P. R. 54(b); *see CDA v. Camacho*, 2010 MP 19 ¶ 5.

## III. STANDARDS OF REVIEW

¶ 8     There are three broad issues on appeal. We first review whether the dismissals of the equal protection claims were proper for both appellants, including whether the trial court used the correct level of scrutiny in its analysis. Dismissal of a claim under Rule 12(b)(6) is reviewed de novo. S*yed v. Mobil Oil Mariana Islands, In*c., 2012 MP 20 ¶ 9. We are also asked to decide whether two statutes, 7 CMC § 2202(a)(1) and 7 CMC § 2922, are constitutional. These are constitutional interpretations also subject to de novo review. *Elameto v. Ramsey*, 2018 MP 15 ¶ 13.

## IV. DISCUSSION

¶ 9      As an initial matter, a plaintiff must assert a claim upon which relief can be granted to survive a dismissal under Rule 12(b)(6). *Claassens v. Rota Health Center*, 2021 MP 9 ¶ 31. We "accept factual allegations in the complaint as true and 'construe the complaint in the light most favorable to the plaintiff.'" *Syed*, 2012 MP 20 ¶ 22 (quoting *Cepeda v. Hefner*, 3 NMI 121, 127–28 (1992)).

¶ 10     In all three dismissed complaints, Maratita and Pangelinan alleged that the GLA Cap and ICA Cap arbitrarily discriminate between groups, therefore

---

[1]    We note this fact because the Attorney General represents both a party and the Amicus in this appeal. This dual representation follows a growing line of dubious screening practices by the Attorney General before this Court, in which no explanation about necessary screening procedures or mitigation of any conflict has been provided to assuage the Court's concern about impropriety. *See Appleby v. Villagomez*, 2024 MP 7 ¶¶ 82–83 (Mangloña, J., concurring). As the Commonwealth has a right to enter as an Amicus in cases such as this, *see* SUP. CT. R. 29(a), the Attorney General represents the Commonwealth in litigation, *see* NMI CONST. art. 3, § 11, and the Amicus presented a sufficiently distinct argument from that of CHCC, we find that justice required our acceptance of the Amicus's chosen representation, despite concerns for a conflict of interest between Amicus Commonwealth and Appellee CHCC. Because both entities are represented by the same office and Amicus clearly supports and directly supplements CHCC, it is perhaps more appropriate to refer to the Commonwealth as an *Amicus reus*, rather than *Amicus curiae*. *See New England Patriots Football Club, Inc. v. Univ. of Col.*, 592 F.2d 1196, 1198 n.3 (1st Cir. 1979) (stating that the purpose of an amicus is to provide the court with non-partisan assistance for some matter of law in which the court may be doubtful).

challenging the constitutionality of these statutes. *See* Maratita Complaint at 7–8 and Pangelinan Complaint at 7–9. In our de novo review of constitutionality, we will accept the facts alleged in the complaints as true before determining if the Appellants are entitled to a declaratory judgment that the caps are unconstitutional.

¶ 11    The Equal Protection Clause of the Commonwealth Constitution and the Equal Protection Clause in the Fourteenth Amendment to the United States Constitution both command that "[n]o person shall be denied the equal protection of the laws." NMI CONST. art. I § 6; *see* U.S. CONST. amend. XIV, § 1. Many states also provide near-identical protections in their constitutions. *See*, *e.g.*, *N. Broward Hosp. Dist. v. Kalitan*, 219 So. 3d 49, 59 (Fla. 2017). We consider federal and state interpretations of these equal protection rights in our analysis of the Commonwealth Constitution. While Appellants have alleged that the GLA and ICA Caps violate both the federal and Commonwealth Constitutions, we may decide these issues upon review only of the local Constitution.[2] Before reaching the question of constitutionality, we must first clarify the correct standard of review for equal protection claims.

*A. Courts should engage in a heightened rational basis review of violations of the Equal Protection Clause of the Commonwealth Constitution.*

¶ 12    All parties agree that the standard of review for the damages caps is for a rational basis. However, Appellants argue that rational basis review for equal protection claims must be "heightened" above what the trial court completed. *See* Maratita Br. at 3 *and see* Pangelinan Br. at 2.

¶ 13    This Court has previously stated that a law "need only be rationally related to a legitimate state interest" to survive a rational basis review of constitutionality. *In re Blankenship*, 3 NMI 209, 219 (1992). This explanation of rational basis is the same review used for federal equal protection because it is sourced from federal case law. *See Madarang v. Bermudes*, 889 F.2d 251, 253 (9th Cir. 1989), *reh. den., cert. den.* 111 S. Ct. 54 (1990).

¶ 14    Federal rational basis is highly deferential and places a high burden on the challenger of a law to disprove all possible bases of support. *FCC v. Beach Communications*, 508 U.S. 307, 313 (1993) (holding that rational basis review involves looking at whether "there is any reasonably conceivable state of facts that could provide a rational basis for the classification."). The United States Supreme Court has also stated "when conducting rational basis review, we will not overturn [a statute] unless the varying treatment of different groups or

---

2    Because we find that federal rational basis review is less stringent than that which should be used for assessing claimed violations of the Commonwealth Constitution, *see infra* ¶¶ 14, we do not reach the federal claims. We similarly decline to examine the constitutionality of the statutes at issue under any other theory alleged by Appellants because they request the same relief which we grant through analysis of the Equal Protection Clause.

persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the government's actions were irrational." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84 (2000).

¶ 15　In comparison, heightened rational basis applied across the many states asks courts to analyze "the actual justification for the statute, rather than engage in speculation by considering any and all possible reasons for its enactment." *Balboni v. Ranger American of the VI, Inc.*, 2019 VI 17 ¶ 44. States which have adopted heightened rational basis look for a real connection between the statute in question and its actual justification, rather than any hypothetical support that may be created in litigation. We find the jurisdictions that have implemented heightened rational basis to be persuasive. *See id.* ¶ 48.

¶ 16　The Florida Supreme Court has required, in examining statutes for possible violations of the state's equal protection clause, that the Legislature make findings of fact and explicitly lay out the purpose of each law. *Estate of McCall v. United States*, 134 So. 3d 894, 906 (Fla. 2014). Furthermore, any statement made by the legislature to enact a purpose for the law is considered only *presumptively* correct by the courts and must still be based on actual findings of fact. *Id.* Courts make their own judicial inquiries into the findings of fact relied upon by the legislature while engaged in rational basis review. *Id.* at 905–06 ("[W]e would abandon our obligation . . . were we to simply rubber stamp the Legislature's asserted justification for the cap . . . and fail to consider the existing factors and circumstances to determine whether there is legitimacy to that justification."). A court's inquiry must not look only at the rational relationship of the law with its stated goal at the time of enactment, but also consider possible changes in conditions over time that would result in the law losing a rational relationship with its goals. *N. Broward Hosp. Dist.*, 219 So. 3d at 59. "[E]ven if [a law] may have been rational when it was enacted based on information that was available at the time, it will no longer be rational where the factual premise upon which the statute was based has changed. It is for this reason that Florida courts consider both pre- and post-enactment data in assessing the continued rationality of a statute." *McCall*, 134 So. 3d at 913. In *McCall* and *North Broward*, the Florida Supreme Court struck down two damages caps for violation of equal protection because factual data at the time of enactment only dubiously justified the stated purpose of the laws and there was no evidence that the purported medical malpractice crisis justifying enactment continued to exist more than a decade later. *Id.*; *N. Broward Hosp. Dist.*, 219 So. 3d at 59.

¶ 17　Heightened rational basis review is not a new legal creation and has been used by many states for decades. Since the 1970s, the North Dakota Supreme Court has required that parties show a "close correspondence between statutory classification and legislative goals" for equal protection and substantive due process claims. *Arneson v. Olson*, 270 N.W.2d 125, 133 (N.D. 1978). North Dakota used this test as a stricter alternative to federal rational basis review when considering the constitutionality of damages caps and examining the legislative justifications for those caps. *Id.* In 1978, the North Dakota Supreme Court

referred to this standard of scrutiny as "less clearly defined" than federal rational basis, and while the federal test may remain more clearly defined in case law nationwide, heightened rational basis has become a definite and clear test in the five decades since *Arneson*. *Id.* In all its iterations, heightened rational basis requires there to be a rational connection between the law and a legitimate state interest identified by the legislature itself. *See Trujillo v. City of Albuquerque*, 965 P.2d 305, 314 (N.M. 1998) (stating that the "modern articulation of the rational basis standard" adopted by the court for constitutional review of social and economic legislation is still rational basis review and affirming that the test requires examination of a law for its relationship to a non-hypothetical legislative goal).

¶ 18    Heightened rational basis review is not inconsistent with our previous analysis of equal protection claims. This Court has yet to explain in-depth what rational basis review entails. *See In re Blankenship*, 3 NMI at 219 (stating that a law "need only be rationally related to a legitimate state interest" to stand); *and see Camacho v. N. Mar. Ret. Fund*, 1 NMI 362 (1990) (applying rational basis on an equal protection claim without explaining what the review entailed). Specification that a legitimate state interest must be one that is fully articulated by the Legislature only further explains the requirement set forth in *Blankenship*.

¶ 19    We find, in agreement with a growing number of state high courts, that the proper standard is a heightened rational basis review of the constitutionality of a Commonwealth statute under the Equal Protection Clause of the Commonwealth Constitution. We require a "reasonable connection between the actual, and not just the theoretical, effect of the challenged classification and the statutory goals." *State v. Garcia*, 683 N.W.2d 294, 299 (Minn. 2004). Therefore, we now address whether the $100,000 cap of the GLA and the $300,000 cap on non-economic damages in the ICA each survive heightened rational basis review.

*B. Section 2202(a)(1) does not pass heightened rational basis review.*

¶ 20    The GLA cap in 7 CMC § 2202 was first passed by the Legislature in 1983 as Public Law 3–51. The Public Law set the Commonwealth's limit on liability at the same level where they stand today: $50,000 for wrongful death and $100,000 for all other tort actions. PL 3–51. These limits apply to all demands for compensation for injury, including economic and non-economic damages. *See* 7 CMC § 2201(b)(2). No findings or reasonings were included in the published statute, Public Law, or House Bill—aside from the name of the law being, in part, "An Act to proscribe the limits of government liability in tort." PL 3–51.

¶ 21    Committee Reports from the deliberation of the House Bill which would become the GLA provide insight into the purpose of the Bill: "to permit redress by private individuals for wrongful government action by granting a limited waiver of sovereign immunity." Standing Comm. Rep. 3–59, 1, House Comm.

on Jud'y and Gov'tal Ops. (Aug. 4, 1982).[3] The House Committee further stated that:

> the Commonwealth Government is at its formative stage and cannot as yet offer complete and perfect recourse for the erring actions of a government still developing, still experimenting. The funds and the expertise are at this time too limited to allow for unconditional redress and the consequent risk of exorbitant expense and the instability caused by an unwieldy amount of litigation against the government.
> *Id.*

¶ 22     The Senate Committee reviewing this House Bill noted that "[t]he effect of this measure on availability of qualified physicians in the Commonwealth was an important part of the Committee's investigation." Standing Comm. Rep. 3–176, 2, Senate Comm. on Jud'y, Gov't and Law (Jan. 13, 1983). Reports on this investigation, however, do not appear in the legislative record for the GLA. Letters addressed to the House and Senate Committees similarly reference a danger of losing medical professionals in the Commonwealth if the legislation is not passed, but the Legislature itself never states this purpose or finding in regards to the GLA. *See* Notice of Submission of Committee Report Nos. 3–176, 3–191, 3–59.

¶ 23     In 1983, the $100,000 GLA cap struck "a balance between the needs of an individual harmed by negligent government action and the needs of the taxpayers who must ultimately pay the tab for governmental negligence." Standing Comm. Rep. 3–59 at 2. At that time, the House Committee noted that the unlimited claims against the Commonwealth totaled more than half of the yearly tax revenue. *Id.* From the Committee Reports, it is clear that the purpose of the GLA cap was to limit *temporarily* liability for the Commonwealth.[4]

¶ 24     The GLA was amended in 2006 by Public Law 15–22 in relevant part to introduce an additional cap of "$200,000 per occurrence" of tortious actions. PL 15–22. This addition has the effect of further limiting "the government's liability to a reasonable amount in cases where there are multiple claimants." *Id.* at 3. The Public Law's section of findings and purpose provides no further information about the damages caps in the GLA, despite the Public Law repealing and

---

[3]   The House and Senate Committee Reports regarding Public Law 3–51 were submitted to the Court by Pangelinan following appellate argument. The parties did not provide further legislative findings or history for either damages cap.

[4]   The NMI District Court's 1985 decision in *Gower v. Commonwealth* supports this conclusion as well, though we look only to the Legislature's own justification for the GLA Cap in our review. *Gower*, 2 CR 413, 428 (D. NMI 1985) ("The argument advanced that the Commonwealth is young and unable to shoulder such economic burdens, while successful here, will not indefinitely protect such statutes from successful constitutional challenges.")

reenacting 7 CMC § 2202(a)(1) in its entirety to reaffirm that the prior damages caps would remain at $50,000 for wrongful death and $100,000 per person, unless affected by the $200,000 per-occurrence cap. The 2006 amendment does not provide an alternative purpose for the GLA Cap to the original temporary limitation on liability for a young Commonwealth.

¶ 25      Maratita first argues that the GLA is inapplicable to CHCC because it is a waiver of sovereign immunity for the *Commonwealth*, from which CHCC is oftentimes distinct. The Commonwealth Healthcare Corporation was established in 2010 as a "public corporation." 3 CMC § 2823(a). It is an independent healthcare provider that is "financially self-sufficient" and, in relevant part, responsible for the management of the hospital on Saipan. 3 CMC § 2823(b). Despite these unique characteristics, CHCC is still a part of the Commonwealth government and may be included within the scope of laws made applicable to the government by the Legislature. *See* 3 CMC §§ 2821–39 (establishing CHCC by statute with a Board of Trustees entirely appointed by the Governor).

¶ 26      The GLA permits government liability for "damages arising from the negligent acts of employees of the Commonwealth." 7 CMC § 2202(a). Section 2211 explicitly states that this liability applies to public corporations to the same extent as it applies to the Commonwealth itself. 7 CMC § 2211(a). Furthermore, the Commonwealth Healthcare Corporation Act, codified at 3 CMC §§ 2821–39, provides that the GLA applies to the CHCC. 3 CMC § 2832 ("Immunity from or Indemnity for Civil Liability").[5] It is clear that the Legislature intended for CHCC to be immune from suit beyond the parameters of the GLA.

¶ 27      Appellants have alleged that the GLA Cap violates the equal protection clause under three separate theories. Maratita and Pangelinan collectively claim that 7 CMC § 2202(a)(1) discriminates against three sets of plaintiffs: (1) those whose damages exceed $100,000; (2) those whose damages are caused by the

---

[5]  Maratita attacks the doctrine of sovereign immunity as a violation of equal protection, and asks this Court to abolish it. Maratita Br. at 22. Sovereign immunity is the principle that states cannot be sued in their own courts without their consent. *Alden v. Maine*, 527 U.S. 706, 745 (1999). This Court has assumed that the Commonwealth enjoys sovereign immunity and has accepted that the GLA is a valid waiver of such immunity. *See Kabir v. CNMI PSS*, 2009 MP 19 ¶ 40 n.23 ("Although we assume that the Commonwealth does enjoy sovereign immunity, (*see Sablan v. Tenorio*, 4 NMI 351, 359 n. 12 (1996)), we need not specifically address the issue for the purposes of this opinion because the Government Liability Act statutorily creates and limits governmental immunity."). We have also held that the Commonwealth does not have a right to be free from litigation generally. *Reyes v. Commonwealth*, 2024 MP 8 ¶ 23. As the GLA "statutorily creates and limits governmental liability," *id.*, and applies to CHCC as a public corporation, 7 CMC § 2211(a), it is premature to discuss the constitutionality of sovereign immunity prior to any finding of liability. *Reyes*, 2024 MP 8 ¶ 10 (holding that sovereign immunity is not an asserted right prior to a finding of liability). Having reviewed the arguments and relevant provisions of law, we see no need for further consideration of the constitutionality of the doctrine of sovereign immunity before there has been a finding of liability.

government, as opposed to private healthcare providers; and (3) those whose damages are caused by government negligence as opposed to other sources of injury.

¶ 28    Regarding the first set of plaintiffs, Maratita proposes that the GLA Cap places an arbitrary line between tort victims whose injuries are worth less than $100,000 and those whose injuries are worth more than that amount. The first group is entitled to full compensation, while the latter group will be left without adequate recompense for their injuries. Pangelinan alleges that the GLA cap disproportionately disadvantages people with severe injuries who cannot be fully compensated. The GLA Cap classifies the victims of torts into two categories: those above the cap and those below—a distinction alleged to be arbitrary.

¶ 29    Appellants further argue that the statute impermissibly discriminates between patients who are injured as a result of negligence by a government healthcare provider and those who are injured by a private provider. Under Commonwealth law, tort claims against a private party are capped at $300,000 for non-economic damages. 7 CMC § 2922. Accordingly, a patient with a malpractice claim against a private provider can recover up to $300,000 for pain and suffering damages as well as an unlimited amount in economic damages, while a patient with a malpractice claim against CHCC is limited to $100,000 for both economic and non-economic damages. Pangelinan further alleges that both the GLA and ICA Caps cause a chilling effect on medical malpractice suits because they lower potential recovery amounts below the cost of complex litigation. This chilling effect is also experienced disproportionately by victims of severe injuries, such as those with economic damages exceeding $100,000.

¶ 30    Finally, Maratita argues that the GLA Cap impermissibly discriminates between people who have tort claims against the government and those who have other complaints, such as breach of contract or land takings. The GLA Cap limits only liability for negligence, and the Commonwealth is free to make payments well in excess of $100,000 in other forms of litigation. *See, e.g., In re Estate of Mangabao*, 2019 MP 13 ¶ 2 (stating the Commonwealth was liable for a $19 million judgment for a government land taking).

¶ 31    These matters are on appeal from dismissals under NMI Civil Procedure Rule 12(b)(6), making their records relatively small. Despite this, we find there is sufficient information to adequately inform the court on the constitutionality of these damages caps. To remand to the trial court for further discovery and subsequent findings of fact would not expand the record with operative information. The parties agreed to as much at appellate argument. We hold that rational basis review of a statute for equal protection requires courts to look at the Legislature's "actual justification for the statute," which is readily available to this Court. *Balboni*, 2019 VI 17 ¶ 44. Insofar as we further look to the "actual, and not just the theoretical, effect" of the damages caps and consider changes in conditions in the Commonwealth, no further discovery is needed to convince this Court. *Garcia*, 683 N.W.2d at 299; *N. Broward Hosp. Dist.*, 219 So. 3d at 59.

¶ 32    It is clear that the GLA Cap, on its face, treats certain classes of people differently based on their characteristics or the characteristics of the party causing their injury. Individuals whose damages are caused by government-employed doctors are treated less favorably than those with damages from private healthcare providers. This is apparent looking only at the parties to this appeal: Maratita is limited to a maximum of $100,000 damages against her CHCC doctor under the GLA Cap, whereas Pangelinan faces no such limitation against a private doctor performing a procedure in the same hospital. Similarly, the GLA Cap creates a disparity in treatment depending on the severity of injury and damages. While an individual with minor injury due to government negligence may fully recover their economic damages, individuals such as Appellants with "astronomical" damages "projected to reach into the millions" and in need of help for life will recover only a fraction of their alleged damages. Maratita Br. at 5, Pangelinan Br. at 4. The GLA Cap's differential treatment of individuals based on their injuries clearly implicates the Commonwealth Constitution's Equal Protection Clause.

¶ 33    We conclude that the $100,000 GLA cap on damages in 7 CMC § 2202 fails to satisfy heightened rational basis review. Committee Reports on the GLA say the purpose of this cap was to protect a young government and have qualified doctors in the Commonwealth. Standing Comm. Rep. 3–59, 1, House Comm. on Jud'y and Gov'tal Ops. (Aug. 4, 1982); Standing Comm. Rep. 3–176, 2, Senate Comm. on Jud'y, Gov't and Law (Jan. 13, 1983). These purposes, if they were ever rationally related to a $100,000 damages cap, are patently irrational today.

¶ 34    When a law is unsupported by findings of fact in its enactment, it is within the Court's purview to find that there is no connection between the law and its conclusory purpose. *Balboni*, 2019 VI 17 ¶ 58. In *Balboni*, the Supreme Court of the Virgin Islands found that a damages cap applicable to only vehicular accidents, and not a wider field of torts or personal injury claims, violated equal protection guarantees under a "heightened rational basis standard." *Id.* ¶¶ 57, 60. Similar to the GLA Cap, the *Balboni* damages cap was allegedly passed to stabilize the automobile insurance market, without reference to any legislative findings or discussion about this purpose. *Id.* ¶ 52. Furthermore, the purposes discussed by senators supporting an amendment to the cap eight years after its enactment were inconsistent, drawing the purpose of the statute away from the originally suggested support of the insurance industry. *Id.* ¶¶ 53–57. The court declined to speculate upon any rational purpose for the damages cap and found that the amount of the cap "is purely arbitrary, and is not based on any studies, actuarial analysis, or other evidence." *Id.* ¶ 58.

¶ 35    Courts must also consider the relationship between a law and its stated purpose both at the time of enactment and through the passage of time, considering changes in conditions that were necessary for the formation of a rational relationship. *N. Broward Hosp. Dist.*, 219 So. 3d at 59. The Florida Supreme Court struck down a non-economic damages cap because it did not pass the rational basis test: there was no "rational relationship to the Legislature's

stated interest." *Id.* at 56. The Court found that the $500,000 cap created an arbitrary distinction between classes of victims, reducing the damages of only the most drastically injured victims. *Id.* at 57. The cap bore no rational relationship to the purported medical malpractice crisis at the time of its enactment, and, furthermore, the Court found no evidence that the crisis had continued to present day. *Id.* at 59.

¶ 36    *North Broward* built on the Florida Supreme Court's holding in *McCall*, which declared a non-economic damages cap on wrongful death suits to be unconstitutional for similar reasons. 134 So. 3d 894. *McCall* found the Florida statute violated the equal protection clause because the plain language of the statute irrationally limited damages only for multiple claimants or victims of medical negligence with large families, because the statute provided a strict dollar amount cap per death. *Id.* at 902. The plurality decision in *McCall* further found that the wrongful death statute failed the rational basis test because current data shows that the purported "medical malpractice crisis" touted as the "state purpose" of the law did not exist. *Id.* at 901, 914. In her concurrence, Justice Pariente agreed with the plurality's finding that there is "no evidence of a continuing medical malpractice crisis that would justify the arbitrary reduction" in damages by the cap. *Id.* at 921. In passing the statutory cap, the Florida Legislature made findings based on a study that concluded jury awards of non-economic damages were a key factor behind unavailability of medical malpractice insurance in the state. *Id.* at 906. The plurality opinion held that the cap, as passed by the legislature, was not fully supported by data at that time or over a decade later. *Id.* at 907, 910.

¶ 37    The Commonwealth is no longer a young government in the same sense of 1983 when the GLA was passed. The population, economy, and size of government have all greatly increased in the last forty years. The Legislature intentionally noted that the payment of claims before the enactment of the GLA was half of all the government's revenue. It is unclear today whether this statement would still be true, considering the growth of the Commonwealth.[6] CHCC, nor any party, has indicated that this information exists to either this Court or the court below. It is apparent, though, that the primary purpose of the GLA—to protect a young Commonwealth from financial liability—has been achieved through the passage of time. The Commonwealth is now in its fifth decade. This Court cannot rubber stamp the continued unequal treatment of different individuals without findings that the Commonwealth has not matured fiscally since 1983.

¶ 38    It would further be conjecture and speculation for this Court to assume that the same conditions present in 1983 surrounding government-employed doctors also exist today, without evidence related to this point. The Legislature, despite completely repealing and reenacting the GLA only two decades ago, has

---

[6]    *Compare* PL 3–54 (setting the Commonwealth's Fiscal Year 1983 budget at $41 million) *and* PL 23–26 (setting the Fiscal Year 2025 budget at $111 million).

made no further explanation or findings on the status of doctors in the Commonwealth. Similar to *Balboni*, this outdated issue cannot continue to be patched by a purportedly temporary solution, if even a solution is still required.

¶ 39    The lack of any findings of fact regarding "the availability of qualified physicians in the Commonwealth" in Public Law 3–51 further raises the concern of whether this second purpose was ever rationally related to the Cap itself. The Legislature provides no explanation for choosing $100,000 as the cutoff amount for liability. Where other courts have struck down higher damages caps than the GLA Cap, those laws have still been supported by some findings of fact or incorporated relevant research. *See, e.g.*, *McCall*, 134 So. 3d at 907. The sparse record for this cap cannot provide sufficient support for its constitutionality even at the time of enactment. Economic legislation, such as the GLA Cap, must be fully supported by data to not create an arbitrary distinction between groups. *Id.*

¶ 40    The $100,000 GLA Cap fails heightened rational basis review today. Though there may have been a rational connection between the cap and its intention to limit the liability of a young government with few qualified doctors, this relationship has been severed by time and natural changes to the Commonwealth. The GLA Cap arbitrarily draws a distinction between individuals on the basis of their injuries and related characteristics, in violation of the Equal Protection Clause. Section 2202(a)(1) is unconstitutional and is struck down.

¶ 41    Our decision today does not invalidate the GLA beyond striking the $100,000 liability limitation. The GLA, as amended in 2006, remains the exclusive remedy for negligence claims, establishing the procedure for adjudicating claims against the Commonwealth and its employees. *See* 7 CMC §§ 2202–10. Appellants do not challenge these provisions. While the GLA continues to govern the procedure for negligence claims, the government's monetary damages liability for such actions is limited only by other applicable caps. We now address the arguments against the Injury Compensation Act.

*C. Section 2922 is unconstitutional under a heightened rational basis review.*

¶ 42    The ICA Cap was added to the Commonwealth Code through Public Law 14–46 in 2004. The ICA allows, for either personal injury or wrongful death, a person to recover up to $300,000 in non-economic damages, including damages for "pain, suffering, inconvenience, mental suffering, emotional distress, loss of consortium, loss of society and companionship, humiliation and injury to reputation." 7 CMC §§ 2921(b), 2922. The Legislature stated that:

> The purpose of the Injury Compensation Act is to further the Commonwealth's interests in maintaining the availability of liability insurance in the Commonwealth, fostering competition in the insurance market, reducing the cost of liability insurance, increasing the types and scope of liability coverage, encouraging the widespread acquisition of liability insurance by individuals and businesses, increasing sources of compensation for victims of

personal injuries, and preserving commercial and economic stability in the Commonwealth and preserving a legal environment of fairness to plaintiffs, defendants and insurers.
PL 14–46.

¶ 43    The public law states that the Act "is in part designed to dissuade insurers from discontinuing the provision of liability insurance in the Commonwealth" and prevent premium rises. *Id.* The Legislature stated, without providing sources or statistics, that the Commonwealth had experienced (1) a decrease in available coverage for certain risks; (2) a rise in premiums such "that they are no longer available to or affordable by individuals and businesses;" and (3) insurers stopped providing liability insurance or expressed an intention to do so in the future. *Id.* Without a limitation on non-economic damage recovery, the Legislature found that private insurance companies would stop operation, causing a negative impact on both the people and infrastructure of the Commonwealth. *Id.*

¶ 44    In the twenty years since the ICA Cap was passed, it has not been amended or updated. The Legislature has supplied no further rationale for the law—including for the $300,000 amount, nor has it changed the damages amount. In this regard, the ICA Cap is extremely similarly situated to the GLA Cap. Both liability limitations are unsupported by factual findings, provide only a conclusory statement as their main purpose, and have been in effect without amendment for approximately twenty years. *Compare* PL 14–46 *with* PL 3–51 *and* PL 15–22. For these reasons, our analysis of the GLA Cap is largely applicable to the ICA Cap. *See supra* ¶¶ 31–40.

¶ 45    Pangelinan argues that the ICA Cap, like the GLA Cap, violates equal protection because it disproportionately disadvantages individuals with severe injuries who cannot be fully compensated. Pangelinan Br. at 8. Pangelinan alleges that the ICA Cap discriminates against one of the same classes that the GLA Cap does: individuals with damages over the cap. The arbitrariness of this distinction between non-economic damages above or below $300,000 renders the cap unconstitutional under the rational basis test.

¶ 46    Pangelinan also claims that the ICA Cap creates a windfall for liability insurance companies in violation of equal protection guarantees. The law does this by shifting the financial burden of negligence to victims, requiring seriously injured parties to fund their own pain and suffering. *Id.* at 10. Pangelinan further acknowledges that this burden-shifting could be rationally related to making liability insurance more affordable, because "insurers can more accurately predict their maximum liability" when it is definitively capped for non-economic damages. *Id.* However, they allege that there is no evidence of a proportional reduction in insurance premiums since enactment of the ICA in 2004. *Id.* at 11.

¶ 47    For nearly fifty years, courts across the country have doubted the effectiveness of damages caps on reducing liability insurance prices. *See Wright v. Central Du Page Hosp. Ass'n*, 347 N.E.2d 736, 742 (Ill. 1976); *Arneson v.*

*Olson*, 270 N.W.2d 125, 136 (N.D. 1978); *Fein v. Permanente*, 695 P.2d 665, 690 (Cal. 1985) (Bird, C.J., dissenting); *Smith v. Dep't of Ins.*, 507 So. 2d 1080, 1089 (Fla. 1987); *Lucas v. United States*, 757 S.W.2d 687, 691 (Tex. 1988); *Moore v. Mobile Infirmary Ass'n*, 592 So.2d 156, 167 (Ala. 1991); *Knowles v. United States*, 544 N.W. 2d 183, 188 (S.D. 1996); *Best v. Taylor Machine Works*, 689 N.E.2d 1057, 1077 (Ill. 1997); *N. Broward Hosp. Dist. v. Kalitan*, 219 So.3d 49 (Fla. 2017). As discussed in *McCall*, *supra* ¶ 36, there was "no evidence of a continuing medical malpractice [insurance] crisis that would justify the arbitrary reduction" of non-economic damages by the Florida statute. 134 So. 3d at 921. In the period following the enactment of the cap, the plurality opinion noted that insurance company income rose, while similar reports "failed to establish a direct correlation between damages caps and reduced medical malpractice premiums." *Id.* at 910. The statute was declared irrational and the damage cap amount arbitrary because of this lack of impact after a decade in effect.

¶ 48　　The ICA's $300,000 non-economic damages cap must be rationally related to its explicit purpose of maintaining liability insurance in the Commonwealth. *See Garcia*, 683 N.W.2d at 299. To accept that a rational relationship exists for 7 CMC § 2922 would require this Court to blindly accept the existence of a positive trend for insurance without proof of such. We are unwilling to go against the majority of similar cases to do so.

¶ 49　　The record is devoid of any facts, statistics, or studies regarding the availability of liability insurance in 2004 or at any time since. Like in *Balboni*, the ICA Cap was passed without legislative findings beyond conclusory statements. 2019 VI 17 ¶ 52. Amicus Commonwealth claims that the findings are sufficient to uphold the ICA Cap as constitutional, as the Wisconsin Supreme Court did in *Mayo v. Wisconsin Injured Patients and Families Compensation Fund*, 914 N.W.2d 678 (Wisc. 2018). Amicus Br. at 14. *Mayo*, however, found the damages cap passed a heightened rational basis test directly because the statute's findings were supported with actuarial studies, documentary evidence, and testimony demonstrating the rational connection. *Mayo*, 914 N.W.2d at 693. When compared to the findings highlighted in *Mayo* and *Balboni*, it is clear that the ICA Cap is inadequately supported to withstand any level of scrutiny.

¶ 50　　Furthermore, there is no evidence, in the affirmative or negative, of the ICA Cap's impact on liability insurance in the past twenty years. As held by the Florida Supreme Court in *McCall* and *North Broward*, the lack of evidence of a continuing insurance crisis leads us to find there is no justification for the cap and there is no rational relationship between the personal injury non-economic damages cap and alleviating the purported crisis. *N. Broward Hosp. Dist.*, 219 So. 3d at 59; *see McCall*, 134 So. 3d at 910; *see also Balboni*, 2019 VI 17 ¶ 50 (stating that "the passage of literally decades without amendment or re-examination could render the cap invalid under heightened rational basis review, for the need to address a past crisis does not forever render a law valid").

¶ 51　　Even if we were to accept that there was a genuine threat to the local liability insurance market in 2004, the ICA still fails to provide a connection

between the purpose of the cap and the $300,000 mark. "[T]he fact that a problem exists does not permit the adoption of an arbitrary or unrelated means of addressing the problem." *Best*, 689 N.E.2d at 1073. The ICA Cap creates a meaningless distinction between victims with unrecoverable damages above the cap—those with greater injuries—and those who can fully recover their emotional damages. "[W]e 'fail to see how singling out the most seriously injured medical malpractice victims for less than full recovery bears any rational relationship to the Legislature's stated goal of alleviating the financial crisis in the medical liability insurance industry.'" *N. Broward Hosp. Dist.*, 219 So. 3d at 58 (quoting *Univ. of Miami v. Echarte*, 618 So. 2d 189, 198 (Fla. 1993) (Barkett, C.J., dissenting)).

¶ 52    For these reasons, we conclude that the $300,000 cap on non-economic damages codified in 7 CMC § 2922 violates the Equal Protection Clause of the Commonwealth Constitution. The cap on non-economic damages, as currently written, does not limit the potential damages of either Appellant.

### D. It was an error to dismiss the equal protection claim against Dr. Taro-Atalig.

¶ 53    As a final matter, we note that the lower court dismissed the ICA Cap equal protection violation against Dr. Taro-Atalig upon an incorrect view of the law. The court stated that "Plaintiffs' equal protection claim under 7 CMC § 2922 against Defendant Taro-Atalig is improper because she is a private citizen." Appendix to Pangelinan's Br. at 22–23. This determination misunderstands the basis of the equal protection violation alleged by Pangelinan.

¶ 54    Neither Appellant asserts that the violation of their equal protection rights occurred when they were injured by CHCC or Dr. Taro-Atalig. *See* Pangelinan Br. at 9 *and* Maratita Br. at 6. Instead, both Maratita and Pangelinan allege that it was the Legislature who violated their constitutional right when it passed the damages caps in the GLA and ICA.

¶ 55    While the court is correct that a private actor like Dr. Taro-Atalig cannot violate equal protection by being a tortfeasor, the underlying medical malpractice cause of action is not the concern for constitutionality of the ICA cap. Our determinations that the GLA Cap and ICA Cap are unconstitutional are based on the irrational relationship between these statutes and their purposes ascribed by the Legislature at enactment. Dr. Taro-Atalig, though curiously absent from this appeal, is still a party facing liability for Pangelinan's injuries.

### V. CONCLUSION

¶ 56    We hold that a heightened rational basis review of Commonwealth laws for Equal Protection violations requires a rational connection between a non-arbitrary law and a legitimate government interest identified by the Legislature itself, fully supported by factual data. The GLA Cap of 7 CMC § 2201 and the ICA Cap of 7 CMC § 2922 both treat classes of people differently and without rational relationships to their specific legislative purposes. To uphold either cap would require speculation about the availability of doctors and the stability of the

liability insurance market beyond what we find a rational basis review requires. It is the duty of the Legislature to provide factual findings—including information such as actuarial studies, relevant testimony, or statistical reports—sufficient to show that the stated purpose of the law is supported and the means of the law are not arbitrary. We conclude that 7 CMC § 2202(a)(1) and § 2292 violate the Equal Protection Clause of the Commonwealth Constitution. We further find that the remaining portions of the Government Liability Act and the Injury Compensation Act both apply to CHC as a public corporation. Accordingly, we REVERSE the lower court and REMAND this matter for proceedings consistent with this opinion.

SO ORDERED this 30th day of December, 2024.


 /s/
JOHN A. MANGLOÑA
Associate Justice


 /s/
PERRY B. INOS
Associate Justice


 /s/
F. PHILIP CARBULLIDO
Justice Pro Tempore


COUNSEL

Michael W. Dotts, Saipan, MP, for Plaintiff-Appellant Maratita.

Matthew J. Holley, Saipan, MP, for Plaintiff-Appellant Pangelinan.

Edward Manibusan, Attorney General;
Stephen T. Anson, Assistant Attorney General, for Defendant-Appellee.

Edward Manibusan, Attorney General;
J. Robert Glass, Jr., Chief Solicitor, for Amicus Curiae.

NOTICE

This slip opinion has not been certified by the Clerk of the Supreme Court for publication in the permanent law reports. Until certified, it is subject to revision or withdrawal. In any event of discrepancies between this slip opinion and the opinion certified for publication, the certified opinion controls. Readers are requested to bring errors to the attention of the Clerk of the Supreme Court, P.O. Box 502165 Saipan, MP 96950, phone (670) 236–9715, fax (670) 236–9702, e–mail Supreme.Court@NMIJudiciary.gov.





**E-FILED**
**CNMI SUPREME COURT**
E-filed: Dec 30 2024 03:03PM
Clerk Review: Dec 30 2024 03:04PM
Filing ID: 75332161
Case No.: 2023-SCC-0008-CIV
NoraV Borja

IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

ARAYANEE ANN SABLAN MARATITA,
*Plaintiff-Appellant,*

*v.*

COMMONWEALTH HEALTHCARE CORPORATION / COMMONWEALTH HEALTH CENTER,
*Defendant-Appellee.*

YVONNE REYES PANGELINAN AS GUARDIAN AD LITEM FOR M.P. (D.O.B. XXXX 2020), MINOR CHILD,
HOPE LEILANI REYES GOMEZ, AND JIMMY POLK,
*Plaintiffs-Appellants,*

*v.*

HELEN TARO-ATALIG, M.D., HEALTH PROFESSIONAL CORPORATION DBA SAIPAN HEALTH CLINIC,
AND COMMONWEALTH HEALTHCARE CORPORATION / COMMONWEALTH HEALTH CENTER,
*Defendants-Appellees.*

**Supreme Court No. 2023-SCC-0008-CIV**
Superior Court Civil Actions No. 22-0095 & 22-0063

## JUDGMENT

Plaintiff-Appellants Arayanee Ann Sablan Maratita and Yvonne Reyes Pangelinan, Hope Leilani Reyes Gomez, and Jimmy Polk separately appeal the dismissals of their equal protection claims against Commonwealth Healthcare Corporation, Dr. Helen Taro-Atalig, and Saipan Health Clinic. For the reasons discussed in the accompanying opinion, the Court REVERSES and REMANDS the cases for further proceedings.

ENTERED this 30th day of December, 2024.


/s/ _____
NORA V. BORJA
Deputy Clerk of the Supreme Court